CASE NO: 12-14-00156-CV

FILED IN COURT OF APPEALS
12th Court of Appeals District

JUN 04 2015

TYLER TEXAS
CATHY S. LUSK, CLERK

## IN THE COURT OF APPEALS
## FOR THE TWELFTH DISTRICT OF
## TYLER, TEXAS

INEZ MANIGAULT

*Appellant*

v.

JANE THORN-HENDERSON

*Appellees*

On Appeal from Cause  No. 1228525 145TH JUDICIAL District Court
NACOGDOCHES COUNTY TEXAS
**BRIEF OF APPELLANT**

Inez Manigault
P. O. Box 81922
Atlanta, Georgia 30366
(843) 367-0007
**Pro Se Litigant**

May 28, 2015                                    **Oral Argument Requested**

## IDENTITY OF PARTIES AND COUNSEL

**APPELLANT**

Inez Manigault

**PRO SE**

## TRIAL COUNSEL FOR APPELLANT INEZ MANIGAULT

W. Wade Flasowski
State Bar No: 24055482
Fairchild, Price, Haley & Smith
www.fairchildlawfirm.com
1801 North Street
Nacogdoches, Texas 75963
Telephone: (936) 569-2327
Fax:          (936) 569-7932

## APPELLEE

Jane Thorn-Henderson

## APPELLATE COUNSEL FOR APPELLEE JANE THORN-HENDERSON

Adam B. Allen
White Shaver, PC
205 West Locust Street
Tyler, Texas 75702

## TRIAL COUNSEL FOR APPELLEE JANE THORN-HENDERSON

James E. Hughes
State Bar No: 10214525
Herald, Farish & Hughes
3400 W. Marshall,
Suite 402
Longview, Texas 75604
Telephone: (903) 297-7681
Fax:          (903) 297-7698

12-14-00156-CV

FILED IN COURT OF APPEALS
12th Court of Appeals District

JUN - 8 2015

TYLER TEXAS
CATHY S. LUSK, CLERK



## TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL................................................ ii

TABLE OF CONTENTS.................................................................... iii

INDEX OF AUTHORITIES..............................................................iv-vii

STATEMENT OF THE CASE................................................................1

STATEMENT REGARDING ORAL ARGUMENT........................................1

STATEMENT OF FACTS..................................................................1-9

ISSUES PRESENTED....................................................................9-10

SUMMARY OF ARGUMENT............................................................11-12

ARGUMENT.............................................................................12-26

CONCLUSION AND PRAYER FOR RELIEF..............................................26

CERTIFICATE OF SERVICE.................................................................

## ISSUES PRESENTED/ENUMERATION OF ERRORS

1. Was the jury selection a fundamental error and prejudicial?

2. The trial court erred in entering judgment because there were legally sufficient evidence to support the claim in damages in this lawsuit.

3. Is there factually sufficient evidence to support the juror's findings and judgment of the trial court?

4. There were legally and factually sufficient evidence of the reasonableness and

necessity of medical expenses to prove a reasonable compensation for physical impairment, loss of earning capacity sustained in the accident for physical pain and mental anguish physical impairment she suffered in the past; and medical expenses, and not submitting mental anguish and physical pain as a single submission.

ii

5. Did the lower court commit a reversible error by excluding critical evidence at trial?

The trial court erred by improperly weighing the evidence and not applying controlling law(s).

6. Did the trial court abuse its discretion and exceeded its power, Due Process?

7. Manigault argues the Ex Parte communication the trial judge, the Defense attorney and his client address bias, prejudice and affected the juror's decision?

8. Did Plaintiff's attorney engage in dilatory practices to defeat his client, and did the attorney act appropriately, when his client reported a sleeping jury to him?

9. Did the behavior pre and post trial along with the admission of false evidence (statements, documents, photographs) by defense attorney inadmissible and speak to willful disregard for the law?

10. The judge erred by submitting a broad form jury question about the damages in the case in Question #2:What sum of money, if paid now in cash, would fairly and reasonably compensate Inez Manigault for her damages, if any, resulting from the occurrence in question?

11. The judge erred by submitting a broad form jury question about the damages in the case in Question #2:What sum of money, if paid now in cash, would fairly and reasonably compensate Inez Manigault for her damages, if any, resulting from the occurrence in question?

12. Does the ruling of the Court Conflict with the Precedent of the Supreme Court?

# INDEX OF AUTHORITIES

**CASES**
**PAGES**

Amanda Sylvia Thompson v. State of Texas,
14-99-00855.................................................................................11

Amazon v. State
487 SO.26.8 (Fla.1986) ...............................................................11

ATL Ins, Co. v. Boyette,
342 S.W.2d 379, 383 (Tex. Civ, App—Beaumont 1960 wit ref'd n.r.e........................ 14

In re Atlanta Pipe Corp., 304 F.3d 136, 143 (1st Cir.2002)...............................22

In re Atlantic Pipe Corp
304 F.3.d, 136, 143 (1st Cir 2002)........................................................22

In re Barry
13 S.W.3d 525, 523 (Tex. Rev. Trib (1988)...............................................23

Blair v. Bukson vs.
521 W.W.2d 652 (Tex.Civ. App.—San Antonio (1975, no wit)................................16

Brown v. Davis
123 S.W.3d 321, 325 (Tex.2002...........................................................11

Citizens & Co Bank v. Maddox ..........................................................22

Citizens National Bank v. Waxahachie Scott
1955 S.W.3d 94, 96 (Tex 2006 ...........................................................13

Dawson v. Briggs
107 S.W.3d 739, 752 (Tex. App.—Fort Worth 2003, no pet.)...............................17

Dawson
102 S.W.3d at 752 .....................................................................17

District Court Harris County on Appeal...................................................23

E. M. Kelley etal Appellant v. Atlantic Gulf Stevedore, Inc. etal................................ .18

In re Estate of Amadt
187 S.W.3d 84,88 (Tex. App.—Beaumont, 205  no pet) .......................................14,21

First Bank of Maretta v. Hartford Underwriters Insurance Company
2002 U.S.  ( App.—LEXIS 21117-25) ................................................................ 22

 First Bank of Maretta v. Hartford Underwriters Insurance Company
2002 U.S.  (FED App.—03561P (6th Cir. 2002 ....................................................... 22

Garza v. Alviar
395 S.W.2d 821, 823 (Tex. 1965...................................................................15

Galleos
357.................................................................................................. 19

Gilbert v. Brownnell Electric
832 S.W.2d 143, 144-451  (Tex. App. Tyler 1992) .................................................21

Golden Eagle Archery
116. S.W.3d at 772.................................................................................17

Grammar Group
S.W.3d at, 2012 WL 1025781,4.................................................................. 20

Harris City v. Smith
96 S.W.3d 230, 234 (Tex. 2002) Tex R. App. P. 44 (a)(2).........................................25

Marshall v. Jerrico Inc.,
446  U.S. 238, 242, 100 S.Ct 1610, 64 Lei 2d 182 (180)...............................................22

Martin v. Warren Miller Company
629 S.W. 2d 706, 709 (Tex. App - Tyler 1982, no wit) ............................................19

Miller v. Wilson
456 S.W.3d 654, 657 (Tex - 2000) .............................................................11,13

Morgan v. Com Graphic Corp.
675 S.W.2d 729, 731, 9 (Tex. 1984)...............................................................25

Morgan v. Compugraphic Corp.
729 S.W.2d 729, 733 (Tex. 1984) ...................................................................26

Norman 668 So; 20@1019-1020........................................................13,26

Norris v. Jackson:
2-09-265-CV 2010 WL 426154 (Tex. App-Fort Worth Oct. 28, 2010 no pet.............17

Pisgras v. Hart
832 S.W.2d 360, (Tex, app - Fort Worth 1992 (writ denied).........................15

Robert Earl Lee v. The State of Texas
248th District of Texas ...............................................................................23

Roger Merritt thie Loman v. The State of Texas
(12-2005).....................................................................................................23

Service Comp International Guerra
348 S.W.3d 221 (Tex.2011)........................................................................17

Signal Oil & Gas Corp. v. Universal IiL Products
572, S.W.2d 320 (Tex 1978)......................................................................18

Smith v. Southernwestern Bell................................................................9

Strickland
466 U.S. at 687; Young
25 S.W.3d at 712...............................................................12,23,24,25

S. V. Gigax
605 F.26 507 (10th Cir. 1979.......................................................................23

Timothy J. Walh & Serena Chan...........................................................18

487 SO.26.8 9 (Fla 1986)..........................................................................13

Thomas v. Oil Gas Building, Inc.
582 S.W.2d 873, 881 Tex Civ App. Corpus Chritisti:1979 writ ref'd n.r.e...................19

## United Federal Statues

Service Act of 1968.................................................................................12

Title III of the Civil Rights Act of 1964..........................................................13

28 U.S. C. A. @ 1651...............................................................................22

28 U.S. C.S Sec. 455...............................................................................22

## Codes

Tex Civ. Prac & Rem Code 18.091................................................................19

Texas Code 41.0105................................................................................ 19

## Rule

Texas District Rule 1.02(b)........................................................................24

# I. STATEMENT OF CASE

This appeal is from a judgment for damages incurred as a result of personal injuries caused by a motorist's negligence (failure to control speed), while Manigault was stopped for a red traffic light. The case proceeded to trial before a jury on May 13th & 14th (Clerk's Record 10). Upon the vote of twelve jurors, Manigault was awarded $7,517.63. A motion for an enlargement of time was filed by Manigault on May 23, 2014. The request was denied, by the trial court (CR 119-121). The Motion would ask the court to disregard the juror's judgment and move for a new trial, under case No. C1228525, filed in the Clerk of Court's office on August 13, 2012, by Plaintiff acting Pro Se. The jury returned a verdict adverse to Manigault's request for an amount reasonable in damages and Judge Campbell Cox signed a final judgment on the Jury's verdict on June 6, 2014, (CR 134-135). Manigault timely filed a Notice of appeal on June 10, 2014, (CR 136- 137).

# II. STATEMENT REGARDING ORAL ARGUMENT

Due to the important First Amendment and other constitutional issues in this case, Plaintiff-Appellant request oral argument. This case also presents matters of first impression in the Circuit that would benefit from oral argument. The inclusion of oral argument will significantly aid the decision of this court.

# III  STATEMENT OF FACTS

Beginning with the characterization by the Defense Attorney, James Hughes, the

1

underlying automobile accident as "minor" (RR 90), continuing with the Defense attorney suggestion, that because something bad happened, psychologically Appellant wanted something to peg it to, and exaggerated the severity of the accident (RR 92 & 94). The Defense continuing through presenting to the court, such as: after two and a half years or so later with no treatment, Plaintiff come into court, with no selective summary of evidence regarding her injuries (RR @90), suffered is both demonstrably unjust, wrong and incomplete.

## The Accident

On August 12, 2011, Manigault was headed to Stephen F. Austin College, in Nacogdoches, Texas driving in from Atlanta Georgia. Manigault, stopped for red traffic light, and was violently struck from behind (RR@53) by Defendant, Henderson. The force from the collision was sufficient to cause Manigault to jerk forward and backward, with foot on the brake, the car would not stop, no matter how hard the brake was applied. The car was forced through the traffic light and finally came to rest, several feet away, blocking both lane of traffic (RR 102-115, Dep @20). The court record does not contain a full copy of Plaintiff's nor Defendant's deposition CR@25-30. Manigault, was in shock and emotionally distraught, after the impact. Henderson exited her vehicle to talk with Manigault. The Defendant was very apologetic, and stated "I hit you so hard a part of my bumper fell of and I placed it in my trunk" (Dep @22 CR@21-25). Henderson was cited for failure to control speed by Officer Hancock. (RR @P1,18-45). As the night progressed Manigault, began to feel pain particularly in her neck and back

2

Dep@22. Treatment was received from Nacogdoches Medical Center by Dr. Roger Collins, Medical physician, a Radiology Specialist from Lufkin Radiology who performed a CT Scan, and an Emergency Room (ER) Physician of Forrest County Emergency Center (RR Ex.@5, 10, 11,@14). Dr. Collins, ER diagnosis was no broken bones, Neck Injury Cervical Strain that was more severe at C-3, C-4, through C-6-C7 Appellant's blood pressure escalated, drugs had to be administered for the first time to reduce the pressure. (RR Ex.4. CR 42-52(RR@119-120&122. The doctor prescribed, Flexeril, Naprosyn, and Vicodin. These were to be taken every 4-6 hours or as needed for pain. His instruction was to continue treatment with an Orthopedic doctor (RR@122). Plaintiff, had never taken any of these medication before the accident. After leaving ER, Plaintiff's entire body ached, as told would happen by the ER Physician (Dep@ 24). It was extremely difficult to get comfortable and Manigault had difficulty falling asleep , for the pains and aches (RR@126). Manigault sought treatment, in Atlanta. On Monday, August 14, 2011, Appellant contacted Dr. Fowler, for an appointment. He indicated there was nothing he could do at the time because the entire body ached. He advised to continue taking the medication and wait a couple days before setting up an appointment. The treatment with Dr. Fowler was up to four visits, before being referred to physical therapy. Upon release he indicated once you have been hit with a 4,000 pound machine, you will continue to have pain (Dep@31). Physical Therapy treatment was provided by Toni Allison, of Resolution Physical Therapy. Manigault underwent a series of rigorous treatments from September 2011 - November 22, 2011. The pain

3

persisted, even after physical therapy. Before being released, the therapist provided training for a home treatment training plan, to manage the pain. These treatments would continue each morning throughout life. (Ex.). At one point the pain was unbearable and lasted for several days a Chiropractor, Dr. Ruder was seen (Dep@33). During and after the visit the pain was worst (RR @ 55 & 90 Dep.@33). Manigault continues the physical therapy training each day. Appellant realize you never get well you learn how to manage the pain.

### Background

The accident was reported to Farmer's Insurance Group (FIG) on August 15, 2011. A response letter was received dated, August 16, 2011 ( Ex.1). An agent on behalf of Henderson, met with Manigault, September 1, 2011 ( Ex.2). On March 14, 2012, a letter was sent to FIG claim office, to initiate settlement (Ex.3). Brian Wenger responded to the request letter dated April 20, 2012 (Ex.4), with an offer of $6, 047.14 Plaintiff, telephoned Mr. Wenger, to ask for a better offer. During the conversation, Mr. Wenger, stated, "you should have been resting instead of seeking medical attention." On April 25, 2012, a letter was sent declining Mr. Wenger's offer (Ex@5).

### Filing Complaint

On May 11, 2012, Manigault filed a Complaint C1228321 in the 145th Judicial District Court of Nacogdoches County, Texas, naming Jane Thorn-Henderson and Farmers Insurance Group (FIG) as Defendants (Ex.6) A letter, was received dated June 22, 2012, from Carolyn Martindale, a representative for Defendant and FIG with an

4

offer in the amount of $7, 500.00 ( Ex.7).

Plaintiff entered into contract with W. Wade Flasowski, of Fairchild, Price, Haley & Smith, on July 25, 2012 (Plaintiff Ex@8 CR@ 170). On August 13, 2012, Flasowski, filed a new Complaint C1228525, CR@ 6-13, but did not include Farmers Insurance Group as a Defendant along with Henderson. The attorney did not explain his reason for the exclusion. A letter dated August 1, 2013, was received from Attorney Flasowski, indicating he needed to file a Cause of Non-Suit (CR@180-181), to Plaintiff's Pro Se case filed in the Court Pro Se. The Motion was granted without prejudice by the courts. Manigault made numerous calls to Flowoski, for status of the case, and provided evidence through faxes. After numerous delays between the attorneys, the deposition and mediation were scheduled. Mediations were scheduled for 9/11, 10/1, 10/3, and 10/14 CR@32 of 2013. Manigault was notified Mediation was scheduled for October 3, 2014, in Nacogdoches, Texas at 9:00 a.m. Manigault drove from Atlanta, Georgia to Nacogdoches, Texas to attend the mediation, to find no one present. Manigault was able to reach the attorney at 11:00 a. m. and learned the mediation was cancelled. Everyone was advised of the cancellation except Manigault. After, some time, Flowoski finally agreed to re-schedule for the afternoon(CR@32). No settlement was reached at the conclusion of the mediation (CR@36). A letter was received from the mediator recommending the case be settled for $18,500.00 (Ex.8) Plaintiff was advised by the attorney to tell the mediator, if this offer was made at the beginning stages of the accident, this would be a fair offer.

5

## Trial Case Cause No: Confusion

There are discrepancies on file with the Cause No. Filed by Manigault Pro Se and The Cause No. filed by Attorney Flowoski. The Cause case No: in reference to mediation, on record the Cause No. is for the case filed by Flowoski C1228525 (CR@37). The mediator's letter No.C1228321, copy of the Civil Status Conference No. filed Pro Se, the caption reads Inez Manigault vs. Farmer Insurance Group, et al, the scheduled conference date July 24, 2013 ( Ex)., but The copy on record have Cause No. C1228525 filed by Flawoski (CR@31). A Motion to Limme filed by Flawoksi on May 9, 2014 i, No. C1228321,CR@95, Order Granting Motion to withdraw, issued on May 29, 2014, by Flawoski CR@130, and Order Granting Motion to withdraw filed on May 29, 2014 by Flawoski, and signed by Judge Campbell Cox, on May 30, 2014, CR@31 all are filed in the court at No.C1228321, which not the case at issue and not the case before this court.

## Trial

The trial commenced on May 13th and 14th 2014, with a jury, (RR@1,CR@74). Appellant was not involved in the jury selection process. Appellant first noticed the jury was not diversified. Plaintiff expressed concerns to her attorney about the possible jurors. The attorney stated where the jury members were seated in the courts they had to be chosen for duty. He left the conference room, he returned then stated, he knew who he wanted on his jury, and asked if Plaintiff knew the date she returned to work at Kohl's Department Store after the accident.

A jury of twelve men and women were selected or pre-selected by the attorneys. (Eleven Caucasian 5 men four women) and one African American (female) CR@ 103. As the trial progressed, Plaintiff pointed out a sleeping juror to the attorney, who said it was OK. In a conference room, right before taking the stand a warning came from Flawoski, not to mention: 1. The statement made to Plaintiff by Henderson after the accident "I hit you so hard my bumper fell of", CR@30, Dep@22, or the dilatory tactics, and egregious manner the Defense attorney and representative of the insurance group behaved during pre-trial. 3. Not to mention anything about the insurance company and the wrongful manner in which they treated me. The attorney's reason for the warning was to prevent an appeal. Appellant was not aware another reason existed for attorney's request, the Defense Motion to Limme, until review of the court records preparing for this appeal CR@100-101. Plaintiff became aware of both defense and Plaintiff motion.

The jury heard from four witnesses two for the Appellant, Manigault's daughter testified of her mother's condition before the August 12, 2011 car accident. The testimony confirmed her mother frequently, jogged and exercised before the accident, but after the accident periodically. Manigault's daughter confirmed after the accident Manigault had trouble during car travels, and performing simple chores (RR@60-80). Manigault testified she had problems sleeping, playing with the grandchildren and moving up and down stair steps (RR@97), (Dep@36). Manigault testified regarding the accident and ensuing treatment received that is already outlined above. Officer Hancock

7

testified, Henderson, failed to control speed, struck Appellant in the rear and was the sole cause of the accident. The officer testified to a piece missing from Defendant's car (RR 30&51). The officer also testified, Appellant reported possible injuries sustained during the car accident as my neck began to hurt at the scene of the accident. The Officer wrote a note on her report of Plaintiff's statement. Manigault follow up with a Physician. (Dep@22 RR@7, RR 16&18). The Defendant testified she was the sole cause of the accident, was not paying attention, did not see Appellant in front of her stopped for the red traffic light; did not see the light was red because, she was looking in a store's parking lot, across the street (Hastings); may have been exceeding the speed limit of 45 miles per hour, Appellee (Dep @ 10-13, RR 43, 44, & 47-48); did not honk her horn, hit her brakes, or give any warning before the impact with Appellant's car. Defendant, testified she witnessed Appellant rubbing her neck after the accident (Dep@13,RR@48).

During examinations of both trial and defense attorney, a series of questions were asked regarding medical care and cost (RR@81-100). Records obtained from Nacogdoches Medical Center, the Physical Therapist and Dr. Fowler gave the diagnosis when referred to the Physical Therapist as Cervical Spine Stenstois (CR@ 57-64&RR@Ex.3,4,&5, RR@ Ex 5), Manigault pain was eight out of ten (RR@118). Appellant testified to the significance of the medical doctors findings regarding injuries that flowed from the August 12, 2011, car accident to support the already introduced medical documents. More importantly, critical treatment documents were excluded. In

8

*Smith v. Southernwestern Bell* the court expressly stated that lay testimony of causation is appropriate and sufficient if it establishes a sequence of events that produced a strong logically traceable connection between the event and the condition. All injuries and expenses resulting from this accident were a direct result of the negligence of Henderson.

The case was submitted to a jury upon two questions, on Question #1, the jury found negligence of Defendant caused injury to Manigault. The jury only awarded damages in the amount of $7,573.63. The jury awarded precisely, the amount suggested by Defense attorney, James Hughes RR@99-101. The jury awarded Manigault $1,500 for physical pain and mental anguish suffered in the past, $0, for physical pain and mental anguish that in reasonable probability she will suffer in the future, $1,000, for physical impairment she suffered in the past, $0, for physical impairment that in reasonable probability she will suffer in the future, $5,017.63 for medical expenses incurred in the past, and $0 for loss of earning capacity sustained in the past RR 95, 99 & 100.

The trial court signed a final judgment on June 6, 2014, upon the judgment of the jury's award CR 134-135.

**Appeal**

Manigault timely filed a Notice of appeal on June 10, 2014, CR 136- 137, and challenges the final judgment on the following grounds:

## ISSUES PRESENTED/ENUMERATION OF ERRORS

9

1. Was the jury selection a fundamental error and prejudicial?

2. The trial court erred in entering judgment because there were legally sufficient evidence to support the claim in damages in this lawsuit.

3. Is there factually sufficient evidence to support the juror's findings and judgment of the trial court?

4. There were legally and factually sufficient evidence of the reasonableness and necessity of medical expenses to prove a reasonable compensation for physical impairment, loss of earning capacity sustained in the accident for physical pain and mental anguish physical impairment she suffered in the past; and medical expenses, and not submitting mental anguish and physical pain as a single submission.

5. Did the lower court commit a reversible error by excluding critical evidence at trial? The trial court erred by improperly weighing the evidence and not applying controlling law(s).

6. Did the trial court abuse its discretion and exceeded its power, Due Process?

7. Manigault argues the Ex Parte communication the trial judge, the Defense attorney and his client address bias, prejudice and affected the juror's decision?

8. Did Plaintiff's attorney engage in dilatory practices to defeat his client, and did the attorney act appropriately, when his client reported a sleeping jury to him?

9. Did the behavior pre and post trial along with the admission of false evidence (statements, documents, photographs) by defense attorney inadmissible and speak to willful disregard for the law?

10. The judge erred by submitting a broad form jury question about the damages in the case in Question #2:What sum of money, if paid now in cash, would fairly and reasonably compensate Inez Manigault for her damages, if any, resulting from the occurrence in question?

11. The judge erred by submitting a broad form jury question about the damages in the case in Question #2:What sum of money, if paid now in cash, would fairly and reasonably compensate Inez Manigault for her damages, if any, resulting from the occurrence in question?

12. Does the ruling of the Court Conflict with the Precedent of the Supreme Court?

10

## SUMMARY OF ARGUMENT

The judge should have considered the adverse impact the jury chosen would have on the case, and invoke the Jury Selection Act of 1968, to provide a fair cross section of the community. The judgment was procured by undue means. The trial judge erred in excluding and failing to consider critical evidence established by the Supreme Court of Texas in *Miller v. Wilson and in Brown v. Davis, 123, S. W. 3d 321, 325 (Tex. 2002), Miller v. Wilson, 456 S.W. 3d 654, 657 (Tex. 2000)*. The weight on testimony in this case was great. Photographs, presented to the jury to determine the amount of award, was based on faulty photos that should have been ruled inadmissible. The photograph was taken by the Defendant's Insurance Company. The judge excluded the testimony from Plaintiff which would reveal the hidden fact behind what was not seen, in the photographs to the court. The court allowed the Defense counsel to control the hearing. He abused his power by engaging into Ex. Parte conversation with the Defense counsel and his client in plain sight of the jury, this act was prejudicial to Manigault with the already bias jury selection. The evidence to sway the jury's opinion came from inflammatory, prejudicial, bias statements from the Defense attorney. He did not support his argument with valid information, but appealed to the passion of the jury thus, denying Manigault a fair trial *see Amanda Sylvia Thompson v. State of Texas (14-99-00855)*. In this case the information was fundamentally defective as in Manigault's case. The trial court dismissed Manigault as an outsider, *Amazon v. State 487 So.26.8(Fla. 1986)*, any conversation with the defense are potentially harmful and

11

prejudicial. The same opportunity was not extended to Manigault. Hughes without any objection from the Flowoski, altered evidence to the date return to work to the advantage of the defense in order to shed a negative light on Manigault's testimony. In *Strickland, 466, U. S. at 687; Young 25 S.W.3d at 712,* the trial court's judgment is not supported by factually sufficient evidence. Manigault explains below there were an abundant proof, in the form of testimony by fact witnesses, medical records, documents , some admitted without objection, Defendant's own admission as to causation that flowed from the underlying accident and the uncontroversial and clear testimony of Manigault, to show she has serious life long injuries from the accident to the court. Manigault would have prevailed if the attorney had done what she hired him to do,

## ARGUMENT/CITATION AUTHORIZATON

### 1. **Was the jury selection fundamentally prejudicial**

A claim for negligence, in an automobile accident, involves the same standards for damages analysis as in any negligent case. The judge signed a judgment upon substandard Texas precedent. The court should reverse the trial's court's judgment and remand for a new trial on each element of damages. The Jury Selection and Service Act of 1968, charges the District Court to create a list of names of prospective jurors from voters registration list or supplemented from other sources if necessary, to achieve a fair cross-section of the community  to prevent discrimination. The list must include 1,000 names. In the instant case the jurors' selected was not in direct proportion with

12

the 1968 Act. (CR.103 ). The Supreme Court in *487 So.26.8 (Fla.1986)*, enunciated a new trial based on complained of conduct as a matter of public policy and maintaining the integrity of the jury trial. The courts found while a party is not entitled to a perfect trial, they are entitled to a fair trial, *see Norman 668 SO; 20 at 1019-1020. Title III of the Civil Right Act of 1964,* prohibits discrimination in public facilities. In *Miller v. Wilson (Tex. 2000)* a decision was based on unreasonable determination of the facts in light of the evidence, as in this case.

2. **The trial court erred in entering judgment legally and sufficient evidence:**

The Supreme Court determined if the trial court hold that a verdict is not supported by factually sufficient evidence it should set aside the verdict and if it does not, it goes against the great weight and preponderance of the evidence that it is manifestly unjust *see Citizens Nat'l Bank in Waxahachie v. Scott 195 S.W.3d 94, 96 (Tex 2006).* As in this case, Defense counsel Hughes, in cross examination of witness Rachael Greer, suggested to the jury Appellant was in an accident in Nacogdoches on August 12, 2011, she and her mother drove back to Atlanta on August 13, 2011, and Manigault went directly to work (RR@70&45). Other than the belief and trust in Attorney Hughes, by this court there is no evidence of record to support the trial court findings. Manigault provided sufficient evidence to prove the date Plaintiff returned to work (CR@179). Hughes, also presented both witnesses, and the court a control sheet, used by payroll, and not Appellant's hourly sheet to convince the court she returned to work on August 13, 2011 (RR @Ex. 0014), the day after the accident. Both presentation

13

of the erroneous documents, and statements had a profound impact on the court. Again, without any documented proof he convinced the jury, Manigault quit her job at Kohl's because she wanted to. Manigault testified during her deposition and during her testimony, of the strain being placed on her back by the continuous standing for long hours. The record also prove Manigault, obtained another job with less strain on her body in November 2012 (Plaintiff's Ex. Dep @8, RR@87). The Defense attorney was aware these statements were false when it was made. The court determined the remedy for the improper admission of evidence is a new trial. *In re Estate of Amadt 187. S.W.3d 84,88 (Tex App-Beaumont 205, no pet). (citing Atl. Ins Co. v. Boyette, 342 S. W. 2d 379, 383 (Tex. Civ. App.-Beaumont 1960 writ ref'd n.r.e.).*

The photos was shown and submitted to the jurors to show the extent of damages to plaintiff's car. The trial judge exclusion of critical testimony in reference to why the rear of Appellants car did not crumble when hit from the back destroyed Plaintiff's testimony. Therefore, because of the trial court admission of the erroneous evidence, Manigault ask the court to reverse the judgments award and remand the case for a new trial. More importantly, while Appellant claim the evidence regarding the claims of Manigault is both legally and factually sufficient, critical evidence, were not submitted into evidence. The self-management training to mange pain by Physical therapist and document to show why rear bumper did not crumble. The judge excluded critical testimony in favor of the Defendant.

## 3. IS THERE FACTUALLY SUFFICIENT EVIDENCE TO SUPPORT THE JUROR'S FINDINGS AND JUDGMENT OF THE TRIAL COURT?

14

The evidence does not support the jury's verdict and the trial court findings. Insufficient evidence supporting the court's findings is so weak to the overwhelming weight of the evidence that the findings should be set aside *Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965)*. Defense counsel repetitious harping about:1. Fowler's diagnosis of delay muscle soreness, 2. Here we are two and a half years or so later and Plaintiff is asking for award money with no medical treatment. 3. Defense attorney sarcasm Plaintiff's pain "it is not because I'm getting older" "not because I'm almost 64 years old now. 4. The false photographs of Plaintiff's car, and his statement to the jury it is the best evidence the jury can look at to determine the severity of the accident (RR@94). These comments along with the fact the jury could identify with Defense attorney Hughes prejudiced the jury and tainted the case. Thus, the jury rendered an unfair verdict. Other than surgery (Dep pg 34-37) , there was noting else medically the doctors could do. Also, on the same diagnosis sheet, the attorney was harping from was Dr. Fowler's examination of Plaintiff states: tightness in the cervical spine, she is diffusely tender in her neck and back (RR 88-101).

**4. Sufficient evidence to prove damages and reasonableness**

**a. physical pain and mental anguish suffered in the past: Jury awarded $1,500.00**

A jury may arrive at a fair compensation for physical pain based on common knowledge and their sense of justice, as in *Pipgras v. Hart, 832 S.W.2d 360, Tex. App-Forth Worth 1992 (writ denied)*, The amount of reasonableness compensation for

15

physical pain is not to be determined by a set formula as demonstrated by defense counsel, in this case, when he advised the jury to award the amount of $1,500 (RR@101) this decision should be at the jury's discretion. The Court erred in not submitting mental anguish and physical pain as a single submission. To prove physical pain and mental anguish one must a.) prove what injury was like at the scene of the accident b) prove how painful and frightening the ER treatment was c.) d) self-esteem are sufficient evidence to give a reasonable amount of compensation. The appeals court modified and recommended to the trial court to calculate interest and enter judgment in accordance with the modification. The same should be done for Manigault.

**b. Physical pain and mental anguish that in reasonable probability she will suffer in the future: Jury Awarded $0**

The Appeals Court determine a court is under duty to reconcile conflicting jury findings if at all possible. In *Signal Oil & Gas Co v. Universal Ail Products, 572, S.W.2d 320 (Tex.1978).* The court found the award of medical expenses and denial of compensation for physical pain and mental anguish was against the great weight and preponderance of the evidence to be manifest unjust. Like Plaintiff she suffered spinal injuries the doctor prescribe medication, for and muscle spasm were evident in her case (RR@P4). In *Blair v. Buksn ys 521 W.W.2d 652 (Tex. Civ. App-San Antonio 1975, no.wit).* Medical evidence showed that the accident resulted in soft tissue injury causing a recurrence of back pain. The court reversed the trial court judgment, it concluded in the situation where medical expenses have been awarded, the jury failure to award

16

damages for physical pain and mental suffering is so against the great weight and preponderance of evidence. Future pain and suffering evidence can be sufficient if it show that the person is still suffering up to the time of testimony. Manigault and her daughter testified to the continued pain and suffering. The jury heard an honest, genuine testimony about Manigault's decreased quality of life and change in daily activities, but chose not to believe her, the decrease amount of jogging, traveling and playing with grandchildren. These are all things the jury had to see beneath the surface. As in *Norris v. Jackson: No. 2-09-265-CV, 2010 WL 4261541 (Tex. App-Forth Worth Oct. 28 2010 (no pet),* Manigault provided records to show she had noticeably higher blood pressure,(RR@119) felt scared and she was a different person. See *also Service Comp. Internat'l Guerra, 348, S.W.3d 221 (Tex.2011).* Plaintiff could not sleep at night, and sought treatment, medication for anxiety and pain over what happened in the accident (RR@122&130).

### c. Physical impairment she suffered in the past: The jury awarded $1,000 Question two was presented to the jury by the court.

The courts determined in *Dawson 102 S.W.3d at 752; see also Golden Archery 116, S.W.3d at 772.* It would be appropriate to advise the jury they may consider loss of enjoyment of life as a factor, when determining awards for physical impairment. Loss of enjoyment of life encompasses the loss of the injured party's former lifestyle, *see Dawson v. Briggs 107 S. W. 3d 739, 752 (Tex App. Fort Worth 2003, no pet) see also Golden Eagle Archery, 116, S.W.3d at 772,* when evidence submitted in a case

17

supports, loss of enjoyment of life, it is at best the fact finder consider assessing damages for physical impairment.

### d. Physical impairment that in reasonable probability she will suffer in the future The jury awarded $ 0

If the jury find that appellant suffered injury as a result of the accident, a Court is under duty to reconcile conflicting jury findings if at all possible. In *Signal Oil & Gas Co. v. Universal Oil Products, 572 S.W.2d 320 (Tex.1978).* As in *Timothy J. Walsh & Serena Chan,* the cases were reversed when the trial judge erred and failed to reconcile conflicting jury findings. The court found that it was against the great weight and preponderance of evidence that the jury did not award any damages for pain in the face of the testimony as in Appellant's case. Manigault testified her treating sources said she will never get well, but will be able to manage the pain (RR@5. *See also E. M. Kelley, etal. Appellant v. Atlantic Gulf Stevedores, Inc., et al,* The court found the award of medical expenses and denial of compensation for physical pain and mental anguish was against the great weight and preponderance of the evidence as to be manifestly unjust.

### e. Medical expenses incurred in the past, The jury awarded $5,017.63

Medical expenses, lost wages are valid elements of personal injuries damages there were sufficient evidence to prove causation and reasonableness and necessity of such damages. The best indication of the trauma experience during and after the accident was the elevated blood pressure (RR@p4). A good indication of how Manigault felt during the accident was scared and afraid of being hit by oncoming traffic again, my

18

neck jerked forward, and backward, with my foot on the brake the car was out of control, Plaintiff felt distraught and very disoriented (RR@120, Dep.CR@25-30, Dep. 18-20). Tex Civ. Prac. & Rem. Code # 41.0105 provides that the recovery of medical or health expenses incurred is limited to the amount actually paid and is limited to the amount paid or incurred by or on behalf of Plaintiff. Manigault at the time of the accident paid the amount in Medical Insurance of $572.00 monthly. Before coming to trial. A portion of the amount for services rendered after the accident were written of. The total cost was $7, 603.14, excluding cost for medication. The amount presented to the court at trial was 5, 217.63 (CR@94). The award for damages is largely within the jury's discretion. However, they must award something for every element of damage resulting from an injury see *Martin v. Warren Miller Company 629 S.W.2d 706, 709 (Tex App-Tyler 1982, no wit).*

**f. Loss of earning capacity sustained in the past: The jury awarded $ 0**

Tex Civ. Prac & Rem. Code & 18.091 provides that if a plaintiff seek recovery of loss of earnings or loss of earning capacity evidence to prove the loss must be presented in the form of a net loss after reduction for income tax payments or unpaid tax liability according to the federal income tax law (RR@ Ex.P8). The courts found the fact of injury is acknowledged by the jury, a finding of damage and the jury's failure to award damages is against the great weight and preponderance of the evidence. The jury must award something for every element. *Thomas v. Oil Gas building, Inc., 582 S.W.2d 873, 881 Tex Civ App. Corpus Christi 1979 writ ref'd n.r.e* also see Gallegos at

*19*

*357; Edmonson at 720.* The courts in *Gammar Group S.W.3d at , 2012 WL 1025781, 4,* found the trial court had the discretion to determine whether the proponents has met its burden. Manigault testified to the amount earned at Kohls to be $8.00 an hour. Manigault's attorney did not offer any evidence of the applicable tax rate or Medicare taxes (RR. P4), to the court. Manigault would have prevailed if the attorney had done what she hired him to do

## 5. **Reversible error/exclusion of critical evidence**

The court should reverse the trial court's judgment and remand to the court's for a new trial. The photographs offered at trial did not show the true damages to Plaintiff's automobile. To eliminate the unjust judgment, the trial court could have considered any sworn testimony or other evidence offered during the hearing. Manigault, testified at trial the judge excluded the testimony. Manigault provided proof to her attorney from the Chrysler Corporation, to prove true damages (Plaintiff's Ex 9). Based on the Defense counsels statement "he never saw the information" maybe he did, and maybe he did not (RR@24), and in accordance to the court records the information was never introduced into evidence. The information as explained by the expert, but for the steel rod that was placed in the year, make and model of Manigault's car, during the collision the rear bumper would have crumbled showing signs of severe damages, and the impact of how hard Manigault was hit. The rod sustained most of the blows (rear absorber took most of the impact) (RR@21-32) (Plaintiff's Ex.9). For, these reasons the case should be reversed and remanded to the trial court for further consideration. When

20

evidence is introduced in a hearing the issue become fact questions for the trial court to resolve *see Gilbert v. Brownnell Electric, 832 S.W.2d 143, 144-45 (Tex. App Tyler 1992.* The remedy for the improper admission of evidence is a new trial in *re Estate of Amadt, 187, S.W. 3d 84, 88 (Tex. App-Beaumont 2005, no pet)*. The court did not review the entire record. Only signature pages of Plaintiff's and Defendant deposition is in the court record, no crash record on file from Nacogdoches police department (RR@P1) Accordingly the case should be remanded.

6. **Did the trial court abuse its discretion, exceed its power and deny Appellant Due Process**

The jury witnessed favorable exchange between the judge and Defense team. By this act, did the Judge make clear to the juror's Henderson, was protected by her residency. The trial judge erred in requesting the attorney to continue his representation of Manigault even after a dismissal letter was filed in the courts on May 22, 2014 (CR@ 161). The dismissal letter was ignored by the court. The judge asked Attorney to draft a judgment consistent with the jury's verdict on May 23, 2014 (CR@164-165). A day after Manigault filed her withdrawal letter. However, the attorney's withdrawal letter filed on May 29, 2014 (CR@124) was granted by the trial judge on May 30, 2014 (CR@131). There is no trial worthy evidence to support the court's position and a District Court's case that is fraught with errors. Manigault filed a motion for an enlargement of time on May 23, 2014, to respond to the jury's verdict. It was denied (CR@172-173). The court will find that a rational tier of fact could have

21

found the essential elements of this case at the trial court level. Appellant maintained the trial court abused its discretion in denying Plaintiff's request for an enlargement of time to prepare and respond to the Judgment, and due process. The fundamental idea of due process is Notice and Opportunity to be heard. In *Citizens & Co. Bank v. Maddox*, "the benefit of notice and a hearing before judgment is not a matter of grace, but is one of right." A judgment is void if the rendering court or tribunal acted in manner inconsistent with due process of law. The constitution, by prohibiting the act, renders it void. The Supreme Court caution "a court or tribunal should be cautious in exerting its inherent power and must comply with the mandates of due process" *First Bank of Marietta v. Hartford Underwriters Insurance Company,* 2002 U. S. App. LEXIS 21117, - 25; 2002 FED App. 0356P (6th Cir. 2002); also see *In Re Atlantic Pipe Corp.,* 304 F.3d 136, 143 (1st Cir. 2002). The district court refused to correct the errors made and therefore, Manigault was denied her rights to due process.

## 7. Was the ex-parte communication bias or prejudicial

During the course of the two day trial, Judge Cox, held numerous conversations with the Defense attorney and his client. The conversations were held before court, and during breaks in. plain view of the juror's. The Supreme Court Rule 20 as authorized by 28 U. S. C. A § 1651(a), 28 USCS Sec. 455, and *Marshall v. Jerrico Inc., 446 US 238, 242, 100 S. Ct 1610, 64 L.ED.2d 182 (1980),* states, the neutrality requirement will not be taken on the basis of an erroneous or distorted conception of the facts or the law. The law requires not only an impartial judge but also one who appears to the parties

22

and the public to be impartial. Appellant, does not know if the Merits of the case were discussed. The same courtesy was not extended to Manigault. Henderson, has lived in Nacogdoches for over thirty years (RR@55). As to the Defense attorney he referred to him as Jim (RR@ 63). Is the judge impartial and prejudice against people of color, but also whether reasonable men might question his impartiality, under all circumstances *U. S. v. Gigax, 605 F.2d 507 (10th Cir 1979) also see in re Barr, 13, S.W.3d 525, 523 (Tex. Rev. Trib (1988).* A judge shall not engage in conversation, permit or initiate communication with anyone with interest in a proceeding.

## 8. **Did the attorney engage in dilatory practice**

Appellant argues her trial lawyer was ineffective in failing to: 1.Object to jurors even after Plaintiff voiced her concerns about certain jurors, their distain glare for Plaintiff even before trial began. 2. Plaintiff witnessed and told the attorney about one sleeping juror, the attorney said it was alright, in *Robert Earl Lee v. The State of Texas 248th District of Texas, District Court Harris County, on appeal* a point of error was raised of a sleeping juror, the case was remanded back for further proceeding. *also see Roger Merritt Thie Loman v. The State of Texas (12-2005).* 3. Object to false egregious misleading statements by opposing attorney, which was suspect and misleading to jurors, for instance, to the cause of Manigault injuries, her own fault, her growing age (RR) 4. He did not defend the Plaintiff. Even though his contract states handling the case through appeal process he stated he would not help with the appeal. In *Strickland, 466, U.S., at 687; Tong 25 S.W.3d at 712,* there is a reasonable probability that but for

23

counsel's errors the results of the proceedings could have been different. Manigault contingency agreement did not limit the scope of the lawyers responsibility to his client to representation in the trial court. In fact the agreement did not contain any limitations at all as to the scope of representation. A lawyer is permitted to limit the scope of the representation of a client only, if the client after consultation consents Tex. District Rule of Professional Conduct 1.02b. *Strickland 466, U. S. Young 25 S. W.3d at 712* as in this case counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the sixth amendment fell below standard of reasonableness. Flawoski, committed plain error.

**8.. Did the improper conduct of the board's lawyer (James Hughes, opposing attorney) during the trial and closing argument prejudice the jury toward Plaintiff,**

The defense attorney deprived Plaintiff of a fair trial. The repeated belittlement and unfounded accusations in an apparent effort to prejudice the jury (RR@88-100). Additionally, inherent impermissible appeals to the self interest of the jurors (RR 94, 101, 102). The Supreme Court determined it is every attorney's right to vigorously defend his client's cause but parties are entitled to a fair trial on the merits of the case, uninfluenced deadly appeals to passion or prejudice. Defense misconduct is entirely procedural involving repeated deliberate attempts to obstruct discovery by failing to comply with Court orders.

**10. Trial judge erred by submitting a broad form jury question about the damages: JURY CHARGE:NO. 2: What sum of money if paid now in cash, would fairly and reasonably compensate Inez Manigault for her damages, if any, resulting from the occurrence in question?**

24

The Texas Supreme Court, has held that it is error for the trial court to submit a broad form jury question on damages that include valid and invalid elements of damages. *See Harris City v. Smith, 96 S.W.3d 230, 234, (Tex 2002). Tex R. App P. 44(a)(2).* The jury was further instructed, Do not include any amount for any condition resulting from the failure if any of Plaintiff Inez Manigault to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating her injuries if any, that resulted from the Occurrence in question:

There were evidence submitted of all 3, 4, 5, admitted without object at trial along with Manigault's testimony. Even Defense conceded in their testimony and statements that there was proof from the emergency room, medical doctor private medical doctor, physical therapist an orthopedic visits, The record proved Manigault obtained another job with Macy's department store a less strenuous job, Manigault testified and supplied documents to Plaintiff's attorney of the daily arduous routine exercises for cervical spine, hip & knee she must undergo every morning. The Defense advised the jury to give Manigault $0 because she left her job willingly. In spite of documented proof of job change and continued health care, the jury chose to follow the advice of the defense attorney. With no consideration of Manigault's choice to perform these training was taken away on August 12, 2011. (Ex10). In *Morgan v. Com. Graphic Corp, 675 S. W. 2d 729, 731, 9 Tex. 1984)*, lay testimony prove the nexus the causal nexus between the event sued upon and the plaintiffs injuries must be shown by competent testimony. In this case at hand as outlined above. Manigault was a healthy,

25

vibrant woman who engaged both her work and play. Before the accident she pursued her passion, running, playing with her grandchildren and car travels to visit her grandchildren with energy and enthusiasm. After the accident she never played with her grandchildren again and unable to run consistently, without experiencing pain. A worked extremely hard and diligently to protect her health. She will never get well and there was no other event than the accident, that contributed to her pain. The supreme court have approved this type of proof as sufficient *Morgan v. Compugraphic Corp. 675, S. W. 2d 729, 733 (Tex 1984)*.

**Does the rulings of the Court conflicts with the precedent of the Supreme Court?**

In *Norman 668 So: 20 at 1019-1020,* states: to maintain confidence in the integrity of jury trial while a party is not entitled to a perfect trial, a party is entitled to a fair trial.

## PRAYER

Appellant, Inez Manigault, for the reasons stated above respectfully, ask the court to reverse the judgment of the trial court and remand the case for a new trial.

Respectfully Submitted,

Inez Manigault
P. O. Box 81922
Atlanta, Georgia 30366
(843) 367-0007

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2015, a copy of the foregoing Appellant's Brief  was

mailed to Adam B. Allen of White Shaver, PC

Adam B. Allen
White Shaver, PC
205 West Locust Street
Tyler, Texas 75702

Inez Manigault (Pro Se Litigant
P. O. Box 81922
Atlanta, Georgia 30366
(678) 547 - 3914

# <u>APPEALANT APPENDIX</u>

## CAUSE NO: C1228525

Inez Manigault

Appellant

v.

Jane Thorn-Henderson

Appellee

### List of Documents

1. Final Judgment.................................................................................. .1

2. Response to Report Reporting injuries to Farmers Ins. Co...................................2

3. Meeting with representative Brian Wenger of Farmers Ins. Co. ...........................1

4. Letter to initiate settlement...................................................................... ..3

5.Offer from Brian Wenger Representative of Farmers Ins. Co................................. 3

6. Letter from Plaintiff rejecting Offer.............................................................1

7. Copy of Complaint filed Pro Se ................................................................2

8. Offer from Carolyn Martindale of Farmers Ins. Co.........................................1

9. Letter from Mediator, Douglas J. McCarver Settlement Recommendation...............2

10. Gwinnett County Chrysler Deal- Steel Rod n Bumper.....................................1

11. Physical Therapy Home Training................................................................9

12. Copy of Plaintiff Deposition....................................................................41

13. Copy of Defendant Deposition .................................................................24

CAUSE NO. C1228525

INEZ MANIGAULT                    * IN THE DISTRICT COURT

                                  *

VS.                               * 145TH JUDICIAL DISTRICT

                                  *

JANE THORN HENDERSON              * NACOGDOCHES COUNTY, TEXAS


ORAL DEPOSITION OF

JANE THORN HENDERSON

Volume 1 of 1


ORAL DEPOSITION OF JANE THORN HENDERSON, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above styled and numbered cause on the 22nd day of March, 2013 from approximately 3:17 p.m. to 3:37 p.m., before Liesa Kliman, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at the offices of Fairchild, Price, Haley & Smith, located at 1801 North Street, Nacogdoches, Texas pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

FOR THE PLAINTIFF:
BY: W. WADE FLASOWSKI
Fairchild, Price, Haley & Smith
1801 North Street
P.O. Box 631668
Nacogdoches, Texas 75963-1668
Telephone: 936.569.2327

FOR THE DEFENDANT:
BY: MR. JAMES E. HUGHES
Herald Farish & Hughes
3400 W. Marshall, Suite 402
Longview, Texas 75604
Telephone: 903.297.7681

Page 3

INDEX

PAGE

Appearances . . . . . . . . . . . . . . . . . . . . . 2
WITNESS
JANE THORN HENDERSON

EXAMINATION
BY MR. FLASOWSKI . . . . . . . . . . . . . . . . . 4

SIGNATURE AND CHANGES . . . . . . . . . . . . . . . 21
REPORTER'S CERTIFICATE . . . . . . . . . . . . . . 22

Page 4

JANE THORN HENDERSON, having been first duly sworn, testified as follows:

EXAMINATION

BY MR. FLASOWSKI:

Q Please state your name for the record, ma'am.

A Jane Thorn Henderson.

Q Ms. Henderson, my name is Wade Flasowski and you understand that I represent the plaintiff, Inez Manigault, in this matter?

A Yes, sir, I sure do.

Q Okay. And you understand what we're here to talk about today is a motor vehicle accident that occurred on or about August 12th, 2011?

A Yes, sir.

Q Okay. And am I correct that you were involved in that motor vehicle accident?

A Yes, sir.

Q Okay. And I assume you've had an opportunity to meet with your attorney for a brief period of time in preparation for this deposition?

A Yes, sir.

Q Okay. And you understand that this deposition -- you have been sworn under oath and that your testimony can be presented to a judge or a jury in this case?

A Yes, sir.

Page 5

Q Okay. And you're here to tell the truth, ma'am?

A Yes, sir, I sure am.

Q Great. Ma'am, where do you live?

A I live on 2000 -- 2005 Timberlake Street, Nacogdoches, Texas 75961.

Q How long have you lived there?

A I've lived there, I want to say, about six years.

Q You were living there at the time of this accident?

A Yes, sir.

Q Who do you live with?

A I don't live with nobody.

Q By yourself?

A By myself. My son just moved in.

Q Okay. At the time of the accident, were you living with anybody?

A No, sir.

Q And you mentioned a son. You understand that this case might proceed to a trial here in Nacogdoches County?

A Yes, sir.

Q Okay. And the reason I'm going to ask this question is not to pry into your personal life but just to make sure that I don't have any of your family members or close friends on my jury in this case. You understand that?

A Yes, sir.

Q So let me ask you, do you have any close relatives or

Page 6

friends in Nacogdoches County?

A Yes, sir. I've got some family members and some friends.

Q Let's start with family members.

A Okay. William Thorn.

Q Okay.

A Okay. There is Ann Thorn, that's his wife.

Q Any relatives that don't have the last name Thorn or Henderson?

A My son is Reid, R-E-I-D.

Q What's his last name?

A Leonard Dean Reid. He's my ex-husband.

Q Any -- any relatives with the last name Henderson?

A They all live in Lufkin. It's my husband that just passed away.

Q Do you --

A His family.

Q Stanley?

A Family.

Q Family. Okay. Do you live -- do you have a -- attend a church here in Nacogdoches?

A No, sir.

Q Are you a member of any organizations or groups?

A No, sir.

Q What do you do for a living?

Page 7

A I am self-employed.

Q How are you self-employed?

A I clean houses, I paint, I do it all.

Q Do you have a card?

A No, sir. No, sir. That's what I was doing. That's what I was doing.

Q Okay. And, ma'am, can you tell me what happened in the accident that occurred on August 12, 2011?

A Okay. I was -- I was at work at 217 Travis Street. I -- one of my houses that I do -- one of my houses that I do, they've got rent property. And somebody was moving in that weekend and she wanted me to clean it at the spur of the moment. And I was finishing up one job and then I was at that house cleaning it late that afternoon.

Q Okay.

A In that time of the night. So I stopped for a little break, went to the store, and then I was on my way back to work and I looked over at Hastings parking lot and I hit her in the back end of her car.

Q Okay. Let me back up just a little bit. Okay. My understanding that you had been working cleaning a house that evening?

A Uh-huh. Yes, sir.

Q Okay. And -- and you had decided to take a break and you went to a store?

Page 8

A (The witness nods.)

Q Is that a yes?

A At Rudy's. Yes, sir.

Q And for the ladies and gentlemen of the jury that don't know -- I think most people in Nacogdoches know Rudy's, but that's like a convenience store, correct?

A Yes, sir.

Q Okay. And at Rudy's, I guess you were, you know, gassing up or getting a snack or something?

A I was getting a soda.

Q Okay. Great. How long a break do you think you took?

A Not that -- not that long of a break.

Q Okay.

A Because I had to get -- I was ready to get this house done and get it through, get it over with.

Q How long had you been working on that house that day?

A Oh, it was like maybe about five hours. It was late that afternoon and what -- yeah, about five hours.

Q Okay. And would you agree that the accident happened somewhere pretty -- in the late evening on August 12th, being between 8:30 and maybe even 10:00 at night?

A I think so. I think so. Because it was after dark.

Q Am I correct that you were headed south on North Street when the accident occurred?

Page 9

A I was -- I want to call that south.

Q Okay. Yeah. And, in other words, you were headed towards Stephen F. Austin?

A Yes, sir.

Q Okay. And you were coming from the Rudy's that is up kind of near Nacogdoches Medical Center?

A Yes, sir.

Q Okay. And do you remember how fast you were traveling when the accident occurred?

A I knew I was going a little bit fast, but I was not -- I did not look at my speedometer.

Q Okay. If the accident report were to say that the speed limit at that location was 45 miles per hour, would you disagree with that?

A I don't remember how --

Q I guess my question --

A -- what that speed limit was. That's the whole bit.

Q I guess my question is you wouldn't have any reason to dispute that?

A No, sir, I would not.

Q Okay. And so if -- would it be safe to say that you were going somewhere around 45 miles per hour or close to the speed limit when the accident occurred?

A Yes, sir.

Q Okay. You didn't have an opportunity to hit your

Page 10

brakes before the accident occurred?

A No, sir, because it happened so fast. I was looking in Hastings parking lot like this driving and it -- it happened that fast. I hit her.

Q Okay.

A And that's -- I mean --

Q And so what would you say was the cause of the accident?

A Probably me not paying no attention.

Q You would agree with me that there was nothing that Ms. Manigault, my client, could have done to avoid the accident?

A Explain that.

Q Well, would you agree with me that Ms. Manigault was stopped at a red light?

A Yes, sir.

Q When the accident occurred she was -- she was stopped?

A Yes, sir, because when I hit her -- when I hit her, I saw the light was red.

Q Okay. And, ma'am, I assume from your testimony as well that you are accepting responsibility for this accident?

A Yes, sir, I sure am. It was my fault.

Q Yes, ma'am. And can you tell me what happened to the vehicles after the impact?

Page 11

A After the impact? Okay. She was -- she was in the middle of the road when I hit her and I was -- I put on my brakes and I just stopped right there. I mean, it's like I -- I can't really tell you how far we were apart.

Q Okay.

A But I know she was like up underneath the red light.

Q And so just to clarify, when you -- when you struck Ms. Manigault's vehicle, she wasn't stopped out in the middle of the intersection?

A No, sir.

Q She was stopped behind the line that she should have been stopped behind?

A Yes, sir.

Q And the impact caused her vehicle to be pushed forward out to the intersection and underneath where the red light was?

A Yes, sir.

Q And you actually, after the impact, looked up and saw that there was a red light?

A Yes, sir.

Q And it would have been your responsibility to stop at that red light and not come into contact with Ms. Manigault's vehicle, correct?

A Yes, sir. If I was paying more attention, then I would have not hit her.

Page 12

Q Certainly. I understand that. And after the impact occurred -- or let me ask you this. How would you describe the impact?

A How do I describe it? My airbag didn't come out, so I mean, I just hit her.

Q Okay. And what I'm getting at is, you didn't have an opportunity to hit your brakes or slow down in any way before this impact occurred, correct?

A I did not see -- no, sir. I did not see her car.

Q Would you describe the impact then as being a hard impact?

A Kind of, sort of.

Q Okay. And if Ms. Manigault had described this impact as a violent or a hard impact, that wouldn't be incorrect from your view?

A It was kind of, sort of impact. I mean, it's just like hitting somebody in the rear end and their car moved certain inches or certain feet or whatever.

Q And can you tell me what happened after the impact occurred?

A After the impact occurred, I unbuckled my seat belt and I got out and I was going over there to see if she was all right. And she got up out of her car and she said that she was all right.

Q Okay. Anything else said between the two of you

Page 13

before you left the scene?

A I -- I asked her -- she was sitting in her car and I asked her if she was still all right. And she was rubbing her -- her neck. And she said that her neck was getting a little bit sore. And I politely told her that if you think you're hurt, there is the hospital right down there. Medical Center, and you need to go get checked out.

Q And the medical -- how did she respond?

A She said, well -- she said, "I might. Again, I might not." I said, "Well, if you think you're hurt, then you need to have it checked out."

Q Okay. And so you would agree that if she had went -- gone to the emergency room, that it would have been reasonable at that point in time for her to go and get checked out and receive some medical treatment?

A She needs to.

Q Okay. And so in this case you understand that she did in fact go to the emergency room and receive some medical treatment?

A Well, I was hoping she did, and then I found out that she did.

Q Okay.

A And I'm glad she did.

Q And Medical Center -- from where the accident occurred, can you give the ladies and gentlemen of the jury an

Page 14

idea of how far away the Nacogdoches Medical Center is?

A   I'm not good at distance. I have no idea because where Hastings is, I want to say it's like one, two red lights from Medical Center. I can't give you the distance.

Q   Well, it's relatively close?

A   It's very close.

Q   You could get to it in a minute or so from Hastings if you didn't catch any red lights?

A   Well, probably about five, ten minutes.

Q   Okay.

A   It's very close.

Q   The accident happened in front of Hastings?

A   Yes, sir.

Q   On North Street in Nacogdoches?

A   Yes, sir.

Q   And Medical Center is --

A   Like about five -- five, six, seven, ten minutes away.

Q   Okay.

A   Something like that. It's according on how fast -- if you go the speed limit and all that stuff.

Q   Okay. Do you remember anything else being said by Ms. Manigault at the scene of the accident to you or to anyone else?

A   Not that I know of.

Page 15

Q   Did you say anything else to Ms. Manigault other than what we've described that you can recall?

A   No, sir.

Q   Did the -- someone with the Nacogdoches Police Department come out to the scene of the accident?

A   Two of them.

Q   Okay.

A   Male and female.

Q   Okay. Do you remember their names?

A   No, sir, I sure don't.

Q   Did you have an opportunity to provide to them what happened in the accident?

A   Yes, sir. And I provided them my insurance and my driver's license.

Q   Am I correct that you were issued a citation by the Nacogdoches Police Department?

A   Yes, sir.

Q   Okay. And that citation was for failure to control speed?

A   Yes, sir.

Q   Okay. And what was the outcome of that citation?

A   I've already paid it.

Q   Okay. So you pled either no contest or guilty, one of the other, and paid it?

A   All I had to do was just do the judge and do my fine

Page 16

and I paid my ticket.

Q   Are there any other witnesses to the accident that you remember their names?

A   No, sir.

Q   Do you remember anyone else in the accident coming up and speaking with you?

A   No, sir.

Q   Do you remember anyone else coming and speaking with Ms. Manigault, other than yourself?

A   No, sir.

Q   You haven't had any contact with my client since the date of this accident?

A   No, sir. I sure haven't.

Q   What kind of property damage was there to your vehicle?

A   I've got a hole in my front bumper.

Q   Did the bumper fall off?

A   No, sir.

Q   No bumpers fell off --

A   No, sir.

Q   -- that you can recall?

A   No, sir.

Q   Did you -- did you have your vehicle repaired?

A   No, sir. I have not.

Q   And is your vehicle, as it sits today, in the same or

Page 17

similar condition as it was --

A   Yes, sir.

Q   Let me finish my -- same or similar condition as it was --

A   I'm sorry.

Q   -- at the time of the accident?

A   Yes, sir.

Q   And so that hole that was caused by this accident is still present in your vehicle?

A   Yes, sir.

Q   Do you remember what, if any, kind of damage was done to Ms. Manigault's vehicle?

A   I did not see a scratch on it.

Q   Did Ms. Manigault appear to you to be -- to be hurt or injured when you saw her? In other words, did you see any changes in her physical condition, complexion, or was -- or the way that she was acting that would cause a concern to you?

A   No, sir. The only time is when she was sitting in her car rubbing her neck, and that's the only time.

Q   Ma'am, have you had any problems with the law?

A   No, sir.

Q   Never been arrested?

A   No, sir.

Q   Okay. And I don't want to offend you by that, but I just have to ask that question.

Page 18

A No, sir. You're not offending me.

Q Okay. Never provided a deposition before in any other case?

A No, sir.

Q Never been involved in any other car accidents?

A Huh-uh. No, sir.

Q Have you received any traffic citations other than the one that we've discussed in the last four years?

A One for speeding.

Q What was -- where were you given that ticket?

A Around the loop.

Q Here in Nacogdoches County?

A Yes, sir.

Q And how fast were you going?

A I was -- let me see. I want to say like 65 in a 55.

Q Did you pay that ticket as well?

A Yes, sir, I sure did.

Q Have you ever had your license suspended or revoked?

A No, sir.

Q You have a valid Texas driver's license?

A Yes, sir.

Q Weather conditions on the night in question was clear; am I correct?

A It was clear.

Q Other than it being at night?

Page 19

A Yes, sir.

Q Ma'am, do you think you may have been speeding when this accident occurred?

A I might be a little bit, but I'm not for sure.

Q Ma'am, you don't have any medical expertise, do you?

A What do you mean?

Q Well, have you -- you're not a doctor, are you?

A No, sir.

Q Okay. You didn't go to school for nursing or anything of that sort?

A I used to be a certified nurse aide.

Q Certified nurse aide?

A Yes, sir.

Q What is that?

A It is -- a nurse aide is taking care of elderly people, like in nursing home or in the hospital or something like that.

Q Have you spoken about this accident with anyone since the date of the accident, other than your attorney?

A No, sir.

Q Ma'am, have I been kind and courteous to you today?

A Yes, sir, you sure have.

Q Have you understood my questions?

A Yes, sir, I have.

Q Do you have any questions -- were there any questions

Page 20

that you didn't understand?

A No, sir.

Q Were there any answers that you're thinking back on right now that you think you'd like to further explain or modify at this point in time?

A No, sir.

MR. FLASOWSKI: Pass the witness.

MR. HUGHES: Reserve questions.

(End of Proceedings.)

Page 21

CHANGES AND SIGNATURE

PAGE   LINE   CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, JANE THORN HENDERSON, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
JANE THORN HENDERSON

THE STATE OF TEXAS
COUNTY OF NACOGDOCHES

Before me, on this day, personally appeared JANE THORN HENDERSON, known to me (or proved to me under oath) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2013.

_____
Notary Public in and for the
State of Texas

## Page 22

CAUSE NO. C1228525

INEZ MANIGAULT          * IN THE DISTRICT COURT

                        *

VS.                     * 145TH JUDICIAL DISTRICT

                        *

JANE THORN HENDERSON    * NACOGDOCHES COUNTY, TEXAS

REPORTER'S CERTIFICATION

DEPOSITION OF JANE THORN HENDERSON

MARCH 22, 2013

I, Liesa Kliman, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, JANE THORN HENDERSON, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ 2013, to the witness or to the attorney for the witness for examination, signature and return to me by _____ 2013.

That the amount of time used by each party at the deposition is as follows:

W. WADE FLASOWSKI - 00:20(HOURS:MINUTES)

JAMES E. HUGHES  - 00:00(HOURS:MINUTES)

That $_____ is the deposition officer's charges to the PLAINTIFF for preparing the original deposition transcript and any copies of exhibits;

That pursuant to the information given to the deposition officer at the time said testimony was taken, the following

## Page 23

includes counsel for all parties of record:

W. WADE FLASOWSKI, Attorney for Plaintiff;

JAMES E. HUGHES, Attorney for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 or TRCP will be certified to after they have occurred.

Certified to by me this _____ day of _____, 2013.

_____

Liesa Kliman, CSR#2248

1205 Main Street

Garland, Texas 57040

Telephone: 972.494.2000

Expiration Date: 12/31/13

Firm Registration #216

## Page 24

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to _____, Custodial Attorney;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of _____, 2013.

_____

Liesa Kliman, CSR#2248

1205 Main Street

Garland, Texas 75040

Telephone: 972.494.2000

Expiration Date: 12/31/13

Firm Registration #216

**A**
accepting 10:22
accident 4:12,16 5:8,14 7:8 8:20,25 9:9,12,23 10:1,8 10:12,17,22 13:24 14:12,23 15:5,12 16:2,5,12 17:6,8 19:3,18,19
accidents 18:5
acknowledged 21:21
acting 17:17
action 23:6,8
affix 21:15
afternoon 7:14 8:19
agree 8:20 10:10,14 13:12
aide 19:11,12,15
airbag 12:4
amount 22:17
Ann 6:7
answers 20:3
anybody 5:15
apart 11:4
appear 17:14
Appearances 3:3
appeared 21:20
approximately 1:19
arrested 17:22
asked 13:2,3
assume 4:18 10:21
attached 1:24 24:4
attend 6:21
attention 10:9 11:24
attorney 4:19 19:19 22:14 23:2,3 24:7
attorneys 23:5
August 4:13 7:8 8:21
Austin 9:3
avoid 10:11

**B**
back 7:17,19,20 20:3
belt 12:21
bit 7:20 9:10,17 13:5 19:4
Box 2:4
brakes 10:1 11:3 12:7
break 7:17,24 8:11 8:13
brief 4:19
bumper 16:16,17
bumpers 16:19

**C**
C 2:1
call 9:1
car 7:19 12:9,17,23 13:2 17:19 18:5
card 7:4
care 19:15
case 4:24 5:18,23 13:17 18:3
catch 14:8
cause 1:1,18 10:7 17:17 22:1
caused 11:14 17:8
Center 9:6 13:7,24 14:1,4,16
certain 12:18,18
Certainly 12:1
certificate 3:9 24:9
certification 22:5 23:9 24:1
certified 1:20 19:11 19:12 22:8 23:10 23:11 24:11
certify 22:9 23:4
CHANGE 21:2
changes 3:8 17:16 21:1 24:4,5
charges 22:22
checked 13:7,11,14
church 6:21

citation 15:15,18 15:21
citations 18:7
Civil 1:23
clarify 11:7
clean 7:3,12
cleaning 7:14,21
clear 18:23,24
Clerk 24:10
client 10:11 16:11
close 5:22,25 9:22 14:5,6,11
come 11:22 12:4 15:5
coming 9:5 16:5,8
complexion 17:16
concern 17:17
condition 17:1,3,16
conditions 18:22
consideration 21:22
contact 11:22 16:11
contains 24:5
contest 15:23
control 15:18
convenience 8:6
copies 22:23
copy 24:9
correct 4:15 8:6,24 11:23 12:8 15:15 18:23 21:16
counsel 23:1,4
County 1:4 5:18 6:1 18:12 21:19 22:4
COURT 1:2 22:2
courteous 19:21
CSR#2248 23:16 24:15
Custodial 24:7
C1228525 1:1 22:1

**D**
D 3:1
damage 16:14

17:11
dark 8:23
date 16:12 19:19 23:18 24:17
day 1:18 8:17 21:20 21:22 23:11 24:11
Dean 6:12
decided 7:24
Defendant 2:7 23:3
delivered 24:6,8
Department 15:5 15:16
deposition 1:8,16 4:20,22 18:2 21:15 22:6,11,13 22:18,21,23,24 24:2,3,6,8
describe 12:2,4,10
described 12:13 15:2
disagree 9:14
discussed 18:8
dispute 9:19
distance 14:2,4
DISTRICT 1:2,3 22:2,3
doctor 19:7
doing 7:5,6
driver's 15:14 18:20
driving 10:3
duly 1:17 4:2 22:10

**E**
E 2:1,1,7 3:1 22:20 23:3
either 15:23
elderly 19:15
emergency 13:13 13:18
employed 23:5
evening 7:22 8:21
examination 3:6 4:3 22:15
executed 21:21

exhibits 22:23
expertise 19:5
Expiration 23:18 24:17
explain 10:13 20:4
expressed 21:22
ex-husband 6:12

**F**
F 9:3
fact 13:18
failure 15:18
Fairchild 1:22 2:3
fall 16:17
family 5:22 6:2,4 6:17,19,20
far 11:4 14:1
Farish 2:8
fast 9:8,10 10:2,4 14:20 18:14
fault 10:23
feet 12:18
fell 16:19
female 15:8
filed 24:10
financially 23:7
fine 15:25
finish 17:3
finishing 7:13
Firm 23:18 24:17
first 4:2
five 8:18,19 14:9,17 14:17
Flasowski 2:2 3:6 4:4,7 20:7 22:19 23:2
following 22:9,25
follows 4:2 22:18
foregoing 21:15,21
forward 11:15
found 13:20
four 18:8
friends 5:22 6:1,3
front 14:12 16:16
further 20:4 23:4,6

23:9 24:1

**G**
Garland 23:17 24:16
gassing 8:9
gentlemen 8:4 13:25
getting 8:9,10 12:6 13:4
give 13:25 14:4
given 18:10 21:22 22:12,24
glad 13:23
go 13:7,14,18 14:21 19:9
going 5:20 9:10,22 12:22 18:14
good 14:2
Great 5:3 8:11
groups 6:23
guess 8:8 9:16,18
guilty 15:23

**H**
Haley 1:22 2:3
hand 21:22
happened 7:7 8:20 10:2,3,24 12:19 14:12 15:12
hard 12:10,14
Hastings 7:18 10:3 14:3,7,12
headed 8:24 9:2
Henderson 1:4,8 1:16 3:4 4:1,6,7 6:9,13 21:15,17 21:20 22:4,6,10
Herald 2:8
hereto 1:25
hit 7:18 9:25 10:4 10:19,19 11:2,25 12:5,7
hitting 12:17
hole 16:16 17:8

home 19:16
hoping 13:20
hospital 13:6 19:16
hour 9:13,22
hours 8:18,19
house 7:14,21 8:15 8:17
houses 7:3,10,10
Hughes 2:7,8 20:8 22:20 23:3
Huh-uh 18:6
hurt 13:6,10 17:14
husband 6:14

**I**
idea 14:1,2
impact 10:25 11:1 11:14,18 12:1,3,8 12:10,11,13,14,16 12:19,21
inches 12:18
includes 23:1
incorrect 12:14
Inez 1:2 4:8 22:2
information 22:24
injured 17:15
instance 1:17
instrument 21:21
insurance 15:13
interested 23:7
intersection 11:9 11:15
involved 4:15 18:5
issued 15:15

**J**
JAMES 2:7 22:20 23:3
Jane 1:4,8,16 3:4 4:1,6 21:15,17,20 22:4,6,10
job 7:13
judge 4:24 15:25
JUDICIAL 1:3 22:3

jury 4:24 5:23 8:4 13:25

**K**
kind 9:6 12:12,16 16:14 17:11 19:21
Kliman 1:20 22:8 23:16 24:15
knew 9:10
know 8:5,5,8 11:6 14:25
known 21:20

**L**
ladies 8:4 13:25
late 7:14 8:18,21
law 17:20
left 13:1
Leonard 6:12
Let's 6:4
license 15:14 18:18 18:20
Liesa 1:20 22:8 23:16 24:15
life 5:21
light 10:15,20 11:6 11:16,19,22
lights 14:3,8
limit 9:13,17,23 14:21
line 11:11 21:2
little 7:16,20 9:10 13:5 19:4
live 5:3,4,10,11 6:14,20
lived 5:6,7
living 5:8,14 6:25
located 1:22
location 9:13
long 5:6 8:11,13,17
Longview 2:9
look 9:11
looked 7:18 11:18
looking 10:2
loop 18:11

lot 7:18 10:3
Lufkin 6:14

**M**
machine 1:21
Main 23:16 24:15
Male 15:8
Manigault 1:2 4:8 10:11,14 12:13 14:23 15:1 16:9 17:14 22:2
Manigault's 11:8 11:22 17:12
March 1:19 22:7
Marshall 2:8
matter 4:9
ma'am 4:5 5:1,3 7:7 10:21,24 17:20 19:2,5,21
mean 10:6 11:3 12:5,16 19:6
medical 9:6 13:6,8 13:15,18,24 14:1 14:4,16 19:5
meet 4:18
member 6:23
members 5:22 6:2 6:4
mentioned 5:17
middle 11:2,8
miles 9:13,22
minute 14:7
minutes 14:9,17
modify 20:5
moment 7:13
motor 4:12,16
moved 5:13 12:17
moving 7:11

**N**
N 2:1 3:1
Nacogdoches 1:4 1:23 2:4 5:5,18 6:1,21 8:5 9:6 14:1,14 15:4,16

18:12 21:19 22:4
name 4:5,7 6:8,11 6:13 21:21
names 15:9 16:3
near 9:6
neck 13:4,4 17:19
need 13:7,10
needs 13:16
neither 23:4
Never 17:22 18:2,5
night 7:16 8:22 18:22,25
nods 8:1
North 1:22 2:3 8:24 14:14
Notary 21:24
noted 21:16
numbered 1:18
nurse 19:11,12,15
nursing 19:9,16

**O**
oath 4:23
oath)to 21:20
occurred 4:12 7:8 8:25 9:9,23 10:1 10:17 12:2,8,20 12:21 13:25 19:3 23:10
offend 17:24
offending 18:1
office 21:22
officer 22:11,25 24:3
officer's 22:22
offices 1:21
Oh 8:18
Okay 4:11,15,18,22 5:1,14,20 6:5,6,7 6:20 7:7,9,15,20 7:20,24 8:8,11,14 8:20 9:2,5,8,12,21 9:25 10:5,21 11:1 11:5 12:6,13,25 13:12,17,22 14:10

14:19,22 15:7,9
15:18,21,23 17:24
18:2 19:9
opportunity 4:18
9:25 12:7 15:11
oral 1:8,16 22:11
organizations 6:23
original 22:22 24:2
24:6
outcome 15:21 23:7

**P**

P 2:1,1
page 3:2 21:2 24:4
paid 15:22,24 16:1
paint 7:3
parking 7:18 10:3
parties 23:1,5
24:10
party 22:17
Pass 20:7
passed 6:15
pay 18:16
paying 10:9 11:24
people 8:5 19:16
period 4:19
person 21:21
personal 5:21
personally 21:20
physical 17:16
plaintiff 1:17 2:2
4:8 22:22 23:2
Please 4:5
pled 15:23
point 13:14 20:5
Police 15:4,16
politely 13:5
preparation 4:19
preparing 22:22
present 17:9
presented 4:24
pretty 8:21
Price 1:22 2:3
probably 10:9 14:9
problems 17:20

Procedure 1:24
proceed 5:18
proceeding 23:6
Proceedings 20:9
produced 1:16
property 7:11
16:14
proved 21:20
provide 15:11
provided 15:13
18:2
provisions 1:24
pry 5:21
Public 21:24
purposes 21:21
pursuant 1:23
22:24 23:9
pushed 11:14
put 11:2
p.m 1:19,19
P.O 2:4

**Q**

question 5:20 9:16
9:18 17:25 18:22
questions 19:23,25
19:25 20:8

**R**

R 2:1
read 21:15
ready 8:15
really 11:4
rear 12:17
reason 5:20 9:18
21:2
reasonable 13:13
reasons 24:5
recall 15:2 16:21
receive 13:15,18
received 18:7
record 1:24 4:5
22:12 23:1
red 10:15,20 11:6
11:15,19,22 14:3

14:8
Registration 23:18
24:17
Reid 6:10,12
related 23:4
relatively 14:5
relatives 5:25 6:8
6:13
remember 9:8,15
14:22 15:9 16:3,5
16:8 17:11
rent 7:11
repaired 16:23
report 9:12
reported 1:21
Reporter 1:20 22:8
REPORTER'S 3:9
22:5
represent 4:8
requirements 23:9
Reserve 20:8
respond 13:8
responsibility
10:22 11:21
return 22:15
returned 24:2,4,6
revoked 18:18
right 11:3 12:23,24
13:3,6 20:4
road 11:2
room 13:13,18
rubbing 13:3 17:19
Rudy's 8:3,5,8 9:5
Rule 23:9 24:1,8
Rules 1:23
R-E-I-D 6:10

**S**

S 2:1
safe 9:21
saw 10:20 11:18
17:15
scene 13:1 14:23
15:5
school 19:9

scratch 17:13
seal 21:22
seat 12:21
see 12:9,9,22 17:13
17:15 18:15
self-employed 7:1,2
served 24:9
seven 14:17
shorthand 1:20,21
22:8
shown 24:10
signature 3:8 21:1
21:15 22:15 24:4
similar 17:1,3
sir 4:10,14,17,21,25
5:2,9,16,19,24 6:2
6:22,24 7:5,5,23
8:3,7 9:4,7,20,24
10:2,16,19,23
11:10,13,17,20,24
12:9 14:13,15
15:3,10,13,17,20
16:4,7,10,13,18
16:20,22,24 17:2
17:7,10,18,21,23
18:1,4,6,13,17,19
18:21 19:1,8,13
19:20,22,24 20:2
20:6
sits 16:25
sitting 13:2 17:18
six 5:7 14:17
slow 12:7
Smith 1:22 2:3
snack 8:9
soda 8:10
somebody 7:11
12:17
son 5:13,17 6:10
sore 13:5
sorry 17:5
sort 12:12,16 19:10
south 8:24 9:1
speaking 16:6,8
speed 9:13,17,23

14:21 15:19
speeding 18:9 19:2
speedometer 9:11
spoken 19:18
spur 7:12
Stanley 6:18
start 6:4
state 1:20 4:5 21:19
21:24 22:9
stated 1:24
Stephen 9:3
stop 11:21
stopped 7:16 10:15
10:18 11:3,8,11
11:12
store 7:17,25 8:6
Street 1:22 2:3 5:4
7:9 8:25 14:14
23:16 24:15
struck 11:7
stuff 14:21
styled 1:18
submitted 22:13
subscribed 21:21
Suite 2:8
sure 4:10 5:2,21
10:23 15:10 16:13
18:17 19:4,22
suspended 18:18
sworn 1:17 4:2,23
22:10

**T**

take 7:24
taken 1:18 22:25
23:6
talk 4:11
Telephone 2:5,9
23:17 24:16
tell 5:1 7:7 10:24
11:4 12:19
ten 14:9,17
testified 4:2
testimony 4:23
10:21 22:12,25

Texas 1:4,21,23,23 2:4,9 5:5 18:20 21:19,24 22:4,9 23:17 24:16
therefor 24:5
think 8:5,11,23,23 13:5,10 19:2 20:4
thinking 20:3
Thorn 1:4,8,16 3:4 4:1,6 6:5,7,8 21:15,17,20 22:4 22:6,10
ticket 16:1 18:10 18:16
Timberlake 5:4
time 4:19 5:8,14 7:16 13:14 17:6 17:18,19 20:5 22:17,25
today 4:12 16:25 19:21
told 13:5
traffic 18:7
transcript 22:11,13 22:23
traveling 9:9
Travis 7:9
TRCP 23:10 24:1
treatment 13:15,19
trial 5:18
true 21:15 22:12
truth 5:1
two 12:25 14:3 15:6

**U**
Uh-huh 7:23
unbuckled 12:21
underneath 11:6 11:15
understand 4:8,11 4:22 5:17,23 12:1 13:17 20:1
understanding 7:21
understood 19:23

**V**
valid 18:20
vehicle 4:12,16 11:8,14,23 16:15 16:23,25 17:9,12
vehicles 10:25
view 12:15
violent 12:14
Volume 1:9
VS 1:3 22:3

**W**
W 2:2,8 22:19 23:2
Wade 2:2 4:7 22:19 23:2
want 5:7 9:1 14:3 17:24 18:15
wanted 7:12
wasn't 11:8
was/was 24:2
way 7:17 12:7 17:17
Weather 18:22
weekend 7:12
went 7:17,25 13:12
we're 4:11
we've 15:2 18:8
wife 6:7
William 6:5
witness 1:17 3:4 8:1 20:7 22:10,12 22:14,15
witnesses 16:2
words 9:2 17:15
work 7:9,17
working 7:21 8:17
wouldn't 9:18 12:14

**X**
X 3:1

**Y**
yeah 8:19 9:2
years 5:7 18:8

**#**
#216 23:18 24:17

**0**
00:00(HOURS:... 22:20
00:20(HOURS:... 22:19

**1**
1 1:9,9
10:00 8:22
12 7:8
12th 4:13 8:21
12/31/13 23:18 24:17
1205 23:16 24:15
145TH 1:3 22:3
1801 1:22 2:3

**2**
2 3:3
2000 5:4
2005 5:4
2011 4:13 7:8
2013 1:19 21:23 22:7,14,16 23:12 24:12
203 23:9 24:1
203.3 24:9
21 3:8
217 7:9
22 3:9 22:7
22nd 1:18

**3**
3:17 1:19
3:37 1:19
3400 2:8

**4**
4 3:6
402 2:8
45 9:13,22

**5**

**55** 18:15
**57040** 23:17

**6**
631668 2:4
65 18:15

**7**
75040 24:16
75604 2:9
75961 5:5
75963-1668 2:4

**8**
8:30 8:22

**9**
903.297.7681 2:9
936.569.2327 2:5
972.494.2000 23:17 24:16

CAUSE NO. C1228525

INEZ MANIGAULT   * IN THE DISTRICT COURT

         *

VS.        * 145TH JUDICIAL DISTRICT

         *

JANE THORN HENDERSON  * NACOGDOCHES COUNTY, TEXAS

ORAL DEPOSITION OF

INEZ MANIGAULT

Volume 1 of 1

ORAL DEPOSITION OF INEZ MANIGAULT, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above styled and numbered cause on the 22nd day of March, 2013 from approximately 2:14 p.m. to 3:04 p.m., before Liesa Kliman, Certified Shorthand Reporter in and for the State of Texas, reported by machine shorthand at the offices of Fairchild, Price, Haley & Smith, located at 1801 North Street, Nacogdoches, Texas pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## Page 2

APPEARANCES

FOR THE PLAINTIFF:
BY: W. WADE FLASOWSKI
Fairchild, Price, Haley & Smith
1801 North Street
P.O. Box 631668
Nacogdoches, Texas 75963-1668
Telephone: 936.569.2327

FOR THE DEFENDANT:
BY: MR. JAMES E. HUGHES
Herald Farish & Hughes
3400 W. Marshall, Suite 402
Longview, Texas 75604
Telephone: 903.297.7681

## Page 3

INDEX

                                        PAGE
Appearances. ..................... 2
WITNESS
INEZ MANIGAULT

EXAMINATION
BY MR. HUGHES .................... 4

SIGNATURE AND CHANGES ................. 44
REPORTER'S CERTIFICATE ............... 45

## Page 4

INEZ MANIGAULT

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. HUGHES:

Q  Would you state your name please, ma'am.

A  It's Inez Manigault.

Q  Ms. Manigault, my name is Jim Hughes and I believe we just met for the first time a little while before your deposition started today.  Is that correct?

A  That's correct.

Q  I'm the attorney who represents Jane Henderson in the lawsuit that's been filed against her resulting from your automobile accident back in August of 2011.  Do you understand that?

A  Yes.

Q  Have you ever given a deposition before today?

A  No.

Q  Have you had the opportunity to visit with your lawyer about your deposition?

A  Today?

Q  Yes.

A  We briefly spoke.

Q  Okay.  You feel comfortable that you understand what we're doing here?

A  Yes.

## Page 5

Q  Okay.  Just a couple of things to remind you about that I'm sure you've already heard from your lawyer.  First of all, you understand that the law requires you to tell the truth in your deposition today?

A  Correct.

Q  It's important that you continue as you were doing giving verbal responses because shakes of the head, nods of the head, things like that, when it's transcribed on paper can sometimes be confusing later on.  Okay?

A  Yes.

Q  If I remind you to give a verbal answer today, don't think I'm fussing at you.  That's just something that we do almost without even thinking about it to make sure that we have a clear record later on.  Okay?

A  Yes.

Q  The most important thing I want you to be aware of today is that I don't want you to answer any questions that you don't understand.  All right?

A  Okay.

Q  If I ask a question that you don't understand, it's probably because I've asked it in a confusing way unintentionally.  And if you let me know that I confused you, we'll work until we understand each other.  Okay?

A  Okay.

Q  That way if you give me an answer today, I'm going to

Page 6

assume that you understood my question and gave me the answer that you intended to give. Fair enough?

A Fair.

Q All right. Thank you, ma'am.

Give me your residence address please, Ms. Manigault.

A I use a P.O. box. Do you want a street address

Q I want the street address, please.

A 204 Gentrys Walk, Atlanta, Georgia 30341.

Q Does anybody live with you at that address?

A My daughter when she comes home but, no, I'm alone.

Q Okay. Now, I understand that your daughter is presently a student at Stephen F. Austin; is that right?

A That's correct.

Q And she still considers your home to be her permanent residence, I guess?

A Correct.

Q All right. How long have you lived at that address in Atlanta?

A 2001.

Q All right. Now, I'm assuming that -- this accident happened here in Nacogdoches on North Street. I'm assuming that your being in Nacogdoches had to do with your daughter being in school here; is that correct?

A That's correct.

Page 7

Q Okay. Were you visiting her here when this accident happened?

A Yes. I came to pick her up --

Q Okay.

A -- for a break.

Q Other than your daughter, you probably don't have any relatives that live here in the Nacogdoches area, do you?

A I don't.

Q And are you presently employed, ma'am?

A Yes.

Q Where do you work?

A Macy's Department Store.

Q I think I saw something in some of your records where you had previously worked was it for the Social Security Administration?

A Correct.

Q How long did you work for the Social Security Administration?

A From 1998 through 2011.

Q And what type of work did you do for the Social Security Administration?

A Legal assistant slash paralegal.

Q Was there any particular area of work that you specialized in?

A The legal assistant was basically my job. I worked

Page 8

as a paralegal for about a year.

Q What -- what -- did you work for a specific attorney?

A No. Just for the Social Security Administration.

Q Okay. Now, what are you doing presently at Macy's Department Store?

A Work within the fulfillment center.

Q Is that something where you package items that have been purchased in order for them to be shipped to the buyer, that sort of thing?

A Yes. Correct.

Q How long have you worked for Macy's?

A November of 2012.

Q And what is your salary or rate of pay there?

A Eight dollars an hour.

Q And how many hours do you work on the average a week?

A Probably nine through -- nine through 20 hours. Nine to 15 hours. Just depends.

Q Okay. Give me an idea of what your job duties consist of. I mean, from a physical standpoint, what do you do?

A Basically it's clothing that is purchased. And what I do is just take those clothing -- someone else usually picks it or sometimes I'll go pick the merchandise from the actual area, and then just bag them, put a label on them, send them out.

Page 9

Q Does that involve any type of heavy lifting?

A No.

Q Okay.

A Because usually the items are basically just small items.

Q When you're at work, are you pretty well on your feet the entire time that you work?

A Yes. Basically I'm on my feet, you know, when I'm -- when I'm there. And usually it's only about three, three hours, three and-a-half hours that I --

Q So your --

A -- time maybe.

Q -- usual shift would be about three, three and-a-half hours then?

A Yes.

Q Okay.

A Or sometimes I'll work in the area where we're unpackaging merchandise that comes in. Clothing, pull them out.

Q Okay. Now, where were you working when this accident happened?

A At Kohl's Department Store.

Q And what was your job there?

A I worked in the jewelry department.

Q As a sales clerk?

Page 10

A Yes.

Q And what was your average work week at that time?

A I didn't work as much as -- probably -- let's see. I think I worked with Kohl's like 25 hours a week or more at Kohl's.

Q It's my understanding that you are taking the position that you lost that job because of this accident; is that correct?

A I -- yes.

Q Okay. How long -- when did you start working at Kohl's?

A I'm not sure. I don't remember.

Q Was it -- you told me that you --

A It was part-time before I -- when I was at Social Security.

Q Okay. So you were still working at Social Security --

A No.

Q -- at that time?

A Yes.

Q Okay.

A Uh-huh.

Q And do you recall what your hourly rate of pay was at Kohl's?

A 8.25 an hour.

Page 11

Q Was it a sales clerk position where you would get any type of additional compensation, such as a bonus for making a certain number of sales or commission or anything like that?

A I'm thinking because I really don't remember.
I'd like to revisit the question you asked me. I don't believe I was working at Social Security when I got that job at Kohl's.

Q You had already retired from Social Security?

A I believe so.

Q Would it be --

A I'm not sure, so let's just -- I need to check on that because I don't remember when I started working at Kohl's.

Q Would it have been in the year 2011 when you started working at Kohl's?

A I don't remember.

Q Okay. The accident that we're here to discuss took place on August the 12th, 2011 --

A Uh-huh.

Q -- according to the report. Does that sound correct to you?

A Yes.

Q And after that accident took place, did you ever go back to work at Kohl's?

A Yes.

Q How long did you continue working at Kohl's?

Page 12

A Probably about -- I would say the accident happened in August, probably about two months.

Q Okay. After the accident happened, you returned to Atlanta with your daughter; is that right?

A Correct.

Q How long after the accident was it that you traveled back to Atlanta?

A The very next day.

Q And how did you travel?

A My daughter drove.

Q Did you have a cell phone at the time of this accident?

A I did.

Q And what's the -- what is the air carrier, first of all?

A Sprint.

Q And what is the number?

A I don't have that same number now. I don't remember what it was, but it was -- my daughter had her phone and then I got mine through hers.

Q But you do not have the same cell phone number now?

A No.

Q And you don't remember what your cell phone number was at the time of this accident?

A I don't.

Page 13

Q Tell me a little bit about your education, ma'am. Did you go to school? You told me you grew up in South Carolina; is that correct?

A Uh-huh. Correct.

Q Did you go to high school in South Carolina?

A I did.

Q What school?

A I went to Baptist Hill High School, and then I moved -- my sister moved to Philadelphia, so I moved to help her with her family. So I graduated from high school in Philadelphia.

Q What high school did you graduate from?

A Simon Gratz High Philadelphia.

Q And what year was that?

A 19- -- you would ask me that. 1968.

Q All right. Did you have any education past high school?

A Yes.

Q Tell me what that consisted of, please.

A An undergrad degree in -- an undergrad and a masters degree.

Q Where was your undergrad degree from?

A Southern Illinois University.

Q And what is the -- what is it in?

A Education.

Page 14

Q   And where is your masters degree from?

A   University of Phoenix.

Q   And what is it in?

A   MBA.

Q   When did you receive your MBA?

A   It was while I was working at Social Security. 19 -- I'm not sure about the dates, though.

Q   Okay. And I think I probably know the answer to this question, but have you had any trouble with the law?

A   No.

Q   Are you a Medicare beneficiary?

A   What does that mean? I'm probably not because I don't know what it means.

Q   Do you get Medicare benefits?

A   I don't.

Q   Okay. And what about health insurance? Do you have health insurance presently?

A   Through my retirement with the Social Security.

Q   So you had health insurance at the time this accident took place?

A   (The witness nods).

Q   Your answer is yes?

A   Yes.

Q   Okay.

A   I'm sorry.

Page 15

Q   And have your -- the medical expenses I've seen -- one of the things I want to do today with you is make sure I have all of your medical expenses and bills. But do you know if any or all of your medical expenses relating to this accident have been submitted to your health insurance carrier?

A   No, I'm -- I don't know.

Q   Have you had any accidents prior to this one, been involved in any automobile accidents, that is?

A   No.

Q   Is this -- is it true then that this is the only automobile accident that you've ever been involved in?

A   Yes.

Q   Setting aside automobile accidents for a minute, have you had any other types of accidental injuries that were serious enough to require medical attention of any type?

A   No.

Q   Now, I've been referring to the accident as taking place on August the 12th of 2001 (sic). Does that sound approximately correct to you?

A   Yes.

Q   And about what time of day did the accident happen?

A   It was between 8:30, 10:00.

Q   A.M. or p.m.?

A   P.M.

Q   And what was the weather like?

Page 16

A   It wasn't raining. It was -- and it was clear.

Q   And I understand it happened on North Street, which is adjacent to where we're -- we're taking this deposition; is that correct?

A   Correct.

Q   But it was back behind us. It was farther north than where we are now?

A   Yes.

Q   Tell me your recollection of how it happened please, ma'am.

A   Well, I had just -- I was driving in to pick my daughter up, who was housed on Stephen F. Austin campus, so I was --

Q   Were you just arriving from Atlanta?

A   Yes.

Q   Okay.

A   And there was a traffic light. I stopped at the traffic light.

Q   Okay. Were you the first vehicle in line there at the traffic light?

A   Yes. And I was stopped there at the light and the next thing I knew I was violently struck from behind through the traffic light. I was on the other side of the street. And two gentlemen rushed over and they said that they needed to push me out of the way because they didn't want me to be struck

Page 17

by another vehicle because it was an intersection.

Q   Okay. Let me go back and ask a few questions about the things that you just told me. You were just arriving in Nacogdoches from Atlanta; is that correct?

A   Correct.

Q   How long did it take you to drive from Atlanta?

A   I don't remember because normally it's a -- usually an 11 hour drive, but what I do is I stop and, you know, eat and I have my little places that, you know, I rest and then drive. And so I'm not exactly sure.

Q   Okay. So it's 11 hours actual driving time then?

A   Yes.

Q   And had you started from Atlanta that same morning?

A   Actually, what I normally do is leave like maybe 3:00, 4:00 in the morning so that when it gets light, you know, I'll be at a certain point.

Q   Is that what you did on this day, leave Atlanta at about 3:00 or 4:00 in the morning?

A   Yes.

Q   And so with the addition of some stops to eat and rest, you had been driving more or less continually since 3:00 or 4:00 that morning when the accident happened at about 8:30 or 9:00 p.m.?

A   Uh-huh.

Q   Your answer is yes?

Page 18

A  Yes.

Q  Okay. How were you? Were you tired or anything by that time?

A  No, because that's why I stop and rest so that I wouldn't get tired driving.

Q  Now, you were the first vehicle in line at the light and you were stopped; is that correct?

A  Correct.

Q  What kind of vehicle were you in?

A  Chrysler Sebring.

Q  And it has an automatic transmission, I gather?

A  I'm not sure but --

Q  Does it have a clutch in it?

A  A clutch?

Q  Yes, ma'am. Do you have to shift gears manually?

A  No.

Q  Okay. So you're sitting there and your foot was on the brake, I gather?

A  Yes.

Q  You mentioned that the contact between the two vehicles caused your vehicle to move forward, correct?

A  Through the traffic light on the other side of the street.

Q  Do you know how far that would be?

A  No.

Page 19

Q  Was your -- when you were moving from the position where you were stopped to the position where your vehicle came to a rest again, was your vehicle -- were the tires rolling on the street?

A  Oh, I don't know. All I remember when my neck snapped forward and this horrifying feeling because I was just scared. I -- I wasn't conscious as to, you know, what was going on with the tires or anything. All I knew was I had my foot on the brake but the car was not stopping. And I was scared because I knew that I was, you know, stopped at an intersection.

Q  Do you know whether -- if the impact caused your foot to come off the brake and then you put it back on later?

A  No, because I kept trying to apply the brakes so that the car would stop. I was conscious of --

MR. FLASOWSKI: Let him finish his question before you answer.

THE WITNESS: I'm sorry.

Q  (BY MR. HUGHES) At any rate, when you came to a rest, some gentlemen came to your vehicle with the idea that they were going to move it to get it out of the intersection?

A  Yes.

Q  So was it -- was it actually in the cross part of the intersection still at that time?

A  It wasn't in the cross part of the intersection. It

Page 20

had gone through the intersection on the side of the street, but I don't remember exactly how I was angled. But they wanted to move me because they didn't want another car to hit me.

Q  So it would have been --

A  It was through the intersection.

Q  -- positioned to -- it would have been positioned so that you would have been blocking traffic then?

A  Yes.

Q  Would it have been blocking traffic on the same street that you were traveling on or blocking traffic on the cross street?

A  It would be blocking traffic on the same street that I was on.

Q  Were you aware that there was going to be an impact before it happened?

A  No.

Q  So you didn't tense up or brace yourself?

A  No.

Q  And was the actual contact itself, was that your first -- the first thing that made you aware that an accident either had happened or was going to happen?

A  Correct.

Q  After your vehicle came to a rest, tell me what happened next.

A  Ms. Thorn came running to the car and she kept

Page 21

apologizing. She said that she did not see the traffic light nor did she see me because she was looking to the right at a store that she was going to visit.

Q  When she apologized, was that -- was it your understanding that in doing so she was accepting responsibility for the accident?

A  Correct.

Q  As the accident happened, can you give me an idea about how your body moved within the vehicle?

A  I remember when the impact started that I, you know, went forward. I had my seat belt on, but I went forward like this (indicating) and my neck just flipped back this way.

Q  Okay. And you were wearing your seat and shoulder belt, correct?

A  Correct.

Q  After the accident happened, did you have any bruising from either your seat or your shoulder belt?

A  No.

Q  Other than -- of course, you're seated on the seat?

A  Yes.

Q  You possibly have a headrest behind your back?

A  Correct.

Q  Behind the back of your head, I should say. And you're in contact with the seat and shoulder belt. Other than those contact points with the vehicle, did you come into

Page 22

contact with anything else on the inside of the vehicle?

A No. I just remember my right hand just bearing really hard on the steering wheel because I was trying to, you know, apply the brake, too.

Q Okay. Now, you told me about some conversation that you had with Ms. Henderson. I think you said Thorn. It's Jane Thorn Henderson according to this and --

A Okay.

Q -- I'm not sure really which name she goes by presently. But you told me about some conversation that you had with her. Did you have any other conversations with her?

A I did. Later she asked me how I was doing. And as I progressed that night, you know, even when the policeman was there, I was sharing with her that I was feeling some pain in my neck and in my back. And I told her that I was going to be going, you know, to see a doctor. And she told me that the Medical Center, Nacogdoches Medical Center, was right up the street on the corner, that I could go there.

And also she came -- when she came -- initially approached the car, she said that she went behind my car to look at the back of my car and she said, "Well, I hit you so hard," she said, "My front bumper came off and I took it and put it in the trunk."

Q Okay. Is that pretty well all that you-all discussed there at the scene of the accident?

Page 23

A All I can remember at this time.

Q All right. Had you ever injured your neck prior to this accident?

A No.

Q Ever injured your back before this accident?

A No.

Q Had you ever been to a chiropractor for any type of treatment or evaluation?

A No.

Q So you became aware while you're still there at the scene of the accident that you're starting to experience some pain in your neck and back; is that correct?

A Correct.

Q Are those the two areas of your body that were injured in the accident?

A My -- my legs -- my legs tingled and then I have pains in my legs as well. My hip -- my whole back area I had down to my leg. The day of the accident -- well, the day after the accident, which is what the doctor told me. He said, "After today you will feel worse pain."

But when I went to the Nacogdoches Medical Center, actually, my blood pressure was through the roof at that time and they made -- they gave me some medication, an IV, to pull my blood pressure down. They gave me some Demerol and they also gave me some medication, a prescription for

Page 24

medication, for the next day because he said that, you know, I would feel worse the next day. And that night my neck was hurting. And he ordered a CT scan at that time.

Q Okay. So at the hospital, you were administered medications for your injuries from the accident but also for your blood pressure? And then --

A Yes, because it --

Q I'm sorry.

A Go ahead.

Q And then you were also given a CT scan; is that right?

A Correct.

Q What -- did they do anything else for you there at the hospital?

A They kept me there and monitored me because they wanted to make sure that my blood pressure, you know, went down.

Q How long --

A And then --

Q I'm sorry. Go ahead.

A And then, you know, they wanted to make sure that the pain had subsided to a degree where at least I -- they could release me. So it was -- I stayed -- go ahead. I'm sorry.

Q That's okay. How long were you there in all at the hospital?

Page 25

A An hour and-a-half.

Q Okay.

A And that was after the procedure. After they had -- I'm not -- the hour and-a-half is what they kept after they had administered all the -- the CT scan. So I stayed at the hospital longer than an hour and-a-half, but they kept me there an hour and-a-half to monitor me.

Q From the time you arrived at the hospital until the time you left, how long -- how much --

A I'm not sure.

Q Did you get to the hospital pretty soon after the accident happened?

A Correct.

Q And did you get there by private vehicle or did you go by ambulance?

A I drove.

Q All right. So in taking this in chronological order, after the accident happens, you stay there for a while in order to give the police the information that the police need, correct?

A Correct.

Q You were told about the hospital and where it's located and then you drove yourself to the hospital, correct?

A Correct. Uh-huh.

Q You were there at the hospital being treated and then

## Page 26

being observed for a period of time, correct?

A Yes.

Q And then was it the next day that you rode back to Atlanta in the car with your daughter driving?

A Yes. Well, the doctor told me -- you know, I told him -- because he asked me would I be doing any driving. And I told him, you know, I was from Atlanta. And he said, "Well, I don't want you driving at all because you're going to be in extreme pain tomorrow. Just the first thing you do go pick up the medication and make sure you take that."

So my daughter went and she picked up the medication for me. And I laid down in the backseat of the car, which is what he had instructed me to do and not move, you know. Not sit up or attempt to drive.

Q Okay. After the day of the accident when you went to the emergency room, what is the next medical attention that you had?

A I went to -- the doctor at the Medical Center, Nacogdoches Medical Center, told me to call an orthopaedic doctor to check my back out. When I arrived at home, I called Dr. Fowler.

Q Had you ever been to Dr. Fowler before?

A No.

Q Okay. And did you get an appointment pretty soon with Dr. Fowler?

## Page 27

A I did.

Q And when you went to Dr. Fowler, what did he tell you and what did he do for you?

A He told me that he could not treat me because my whole body was aching and that I needed to continue to take the medication so that -- and then the pain would centralize, then he could determine what area to treat. But he couldn't treat me because everything was hurting at that point. He said which was normal after a car accident.

Q So he told you to basically rest, to let yourself heal some?

A Yeah. Continue -- well, not heal but to continue to take the medication so that the pain -- until the pain, I guess, centralized itself.

Q Did he tell you not to go to work?

A Well, he told me to rest.

Q Okay.

A Yes.

Q Did you --

A He gave me a -- yeah, a -- he gave me a notice to give to my work.

Q Okay. And did you miss some time from work immediately after the accident?

A I did.

Q How long did you miss immediately after the accident?

## Page 28

A Probably about three, four days.

Q Okay. So you missed three or four days --

A Uh-huh.

Q -- after the accident and then returned to work?

A Yes.

Q At some point, did you return to get further treatment from Dr. Fowler?

A I did.

Q About how long after the accident was your second visit with Dr. Fowler?

A Probably about two weeks later. I don't remember exactly the date I went back to him.

Q Okay. That's okay. And what did he do for you at that time?

A He, you know, checked me out, observed what areas -- because at that point there was certain areas that was screaming louder than others. And so --

Q What areas were screaming -- sorry to interrupt you, but what areas were screaming louder?

A From -- from my neck here and my back, middle back. My hips were like strained. You know, I had a strained feeling and then there was like -- I don't know how to describe it, but it was like pain that -- shooting pains going down my legs.

Q So the areas of concern when you were being treated by Dr. Fowler was pain in your neck?

## Page 29

A Uh-huh.

Q Pain in your back?

A Uh-huh.

Q Pain in your hips and shooting pains down your legs?

A Yes.

Q Okay. And did Dr. Fowler ever tell you -- give you a diagnosis, tell you what he thought specifically was wrong with you?

A What he said was that it was typical of the type of pain that I had after a car accident, so he referred me to a physical therapist, to the physical therapist.

Q Okay. And I saw here where you went through a course of physical therapy. That was at Dr. Fowler's referral?

A Yes.

Q And how long did your course of physical therapy last?

A Let me think about it. I don't remember the last date of it, of how many -- I think it was through November, but I'm not sure.

Q Okay. Did Dr. Fowler give you any prescription medications in addition to referring you to physical therapy?

A He didn't because I still had the prescription from the Nacogdoches Medical Center that I could renew.

Q Did he ever -- during your course of treatment with Dr. Fowler, did he ever give you any prescription medications?

Page 30

A   He did not because I had the one from the Medical Center that I could renew.

Q   During your course of physical therapy, did the pain in your neck improve?

A   It improved to the point where I could manage it on my own.

Q   What about the pain in your back, did it improve through your course of physical therapy?

A   Yes, to the point where I could manage it.

Q   Okay. Same thing with regard to your hips, did that improve, also?

A   Yes.

Q   And what about the shooting pain down your legs, did that get better?

A   Yes.

Q   So by the time you finished physical therapy, you mentioned that your neck pain was what you referred to as manageable, correct?

A   Yes.

Q   And your low back pain was manageable; is that correct?

A   Correct.

Q   What about your hips and legs, had they gotten better at that time?

A   I'm still having some issues, especially I'm really

Page 31

concerned about my hips because it gets so strained at times until there is nothing that I do to relieve that. And it happens on a basis where I'm not sure about when it's going to happen, and the same thing happens with my back as well.

Q   Your low back?

A   Yes. Well, in my midback and my lower back, and my legs does the same thing. And I never know when it's going to happen.

Q   Okay. So you don't have these conditions or problems all the time, but they happen intermittently and you don't know when they are going to happen?

A   Exactly.

Q   Okay. And is there -- have you noticed anything that -- that is likely to bring on those pains? Such as certain activities or certain, you know, positions that you might be in? Anything like that?

A   No.

Q   When you finished your course of physical therapy, I understand you don't -- you think it was November, you're not sure. That's fine. When you finished that course of physical therapy, did you return to see Dr. Fowler again?

A   I did not because the last time that I visited him, he concluded that because I was hit by a 4,000 pound machine, he said -- he said it just like that, that normally after that you will continue to have issues with your back. If you had

Page 32

issues with it -- with the accident, then that is going to continue.

Q   Okay. In all, how many times did you go to Dr. Fowler?

A   Four times, I believe.

Q   Okay. Up until the time you finished your physical therapy, you've been to the emergency room here in Nacogdoches?

A   Uh-huh.

Q   You've been to Dr. Fowler in Atlanta?

A   Yes.

Q   And you've had physical therapy. During that timeframe, did you have medical attention from any other professional?

A   During the time of --

Q   Up until the point that your physical therapy ended.

A   You're not talking about after it ended?

Q   No.

A   Just before. No.

Q   I'm trying to keep it in order --

A   Yes.

Q   -- so I can understand it.

A   Yes.

Q   You did or did not have other --

A   I did not.

Q   Okay. After you finished your physical therapy, did

Page 33

you have any other medical attention?

A   Yes.

Q   From whom or what medication?

A   Dr. Ruder.

Q   What type of doctor is Dr. Ruder?

A   A chiropractor.

Q   Did somebody refer you to Dr. Ruder?

A   No. I was having pains in my back and it just, you know, persisted and it was giving me more problem than usual. And after the third day, I decided that I needed to see someone because I -- nothing I could do to relieve the pain.

Q   When you first went to Dr. Ruder, did he do -- I'm sure he gave you an examination for one thing; is that correct?

A   Yeah.

Q   Did he do any other imaging studies, like x-rays?

A   No, he didn't. You know how chiropractor -- I've never been to a chiropractor, but he was just trying to reset some bones and he thought that that might be an area, but you know it was excruciating pain.

Q   You mean the chiropractic treatments were?

A   Yes.

Q   Okay. How many times did you go to Dr. Ruder?

A   Just that once.

Q   Okay. And did you have any other treatment after Dr. Ruder?

## Page 34

A   I did not.

Q   So is it true then that as we sit here today the last treatment that you have had for injuries that you associated with the accident would be from the chiropractor, Dr. Ruder?

A   Yeah, a professional. Yes.

Q   Okay. Do you have any plans to get any additional medical attention?

A   I do not. And for the reason that the physical therapist during the period that I was going through my physical therapy, she taught me what to do and how to do, you know, stretches in order to prevent some of the pain or prevent my muscles from tightening.

Q   Are you still doing the stretches that the physical therapist taught you?

A   Every morning.

Q   Okay. And are you still taking any prescription medication?

A   No, I'm not.

Q   Do you feel that you need some type of prescription medication?

A   Sometimes I do.

Q   Do you have a primary care physician there in Atlanta?

A   I do.

Q   And what's the primary care doctor's name?

## Page 35

A   Maria Arias.

Q   How do you spell that, if you know?

A   I think it's A-R-I-A-S.

Q   Okay. And have you been to Dr. Arias for injuries that you associate with this accident?

A   No.

Q   Whether she's treated you for injuries from this accident or not, have you been to Dr. Arias since the accident happened?

A   That was August 2011. No, I have not. I'm sorry. August 2012 because I do my yearly exam with her.

Q   Okay.

A   Yes.

Q   So you went to Dr. Arais in August of 2012?

A   No. I'm saying the accident was August 2011 and I would have taken my exam with her in 2012.

Q   Okay.

A   But not for the accident.

Q   Do you know how much the chiropractor charged?

A   No, I don't.

Q   I was just looking at a list of your medical expenses and I don't see a -- I don't see anything from the chiropractor but it was just on the one occasion that you went to the chiropractor?

A   Yes.

## Page 36

Q   Do you know how much your medical bills have been relating to the accident?

A   I'm not sure about the exact amount.

Q   Well, let me read you these numbers and then -- you probably don't have it memorized, and I understand that, but let me just read you these numbers and if you -- tell me if there's anything that's obviously missing or anything that you think is clearly incorrect. Okay?

A   Okay.

Q   I have Nacogdoches Hospital, $2,818.14. Forest Country Emergency Physicians, that would probably be the emergency room doctor, $890. Lufkin Radiology, $215. David Fowler, $250. And Resolution Physical Therapy, $3,430.
    First of all, are there any bills that you're aware of that I did not just mention?

A   Are those resent? Because I'm not sure about whether or not all of those bills were paid, so I don't know if the amounts would still be the same.

Q   Right. Well, I mean, were you originally charged -- whether the amounts are still the same or not from having been partly paid, possibly --

A   Yes.

Q   -- are you aware of any charges that you incurred that I did not mention there?

A   You're talking about just personal like maybe the

## Page 37

medication and --

Q   Charges for either medical expenses, that is by way of doctor or physical therapy treatment, or prescription medication costs? Anything like that?

A   Yeah, because those are not added into that.

Q   Okay. I saw one bill mentioned -- but I didn't see the actual bill. I saw it mentioned the sum of $18.59 for prescriptions. Would that -- would that be the total of your prescription medication bills?

A   I'm not sure.

Q   Have your injuries from this accident interfered with any of your non work activities?

A   Absolutely.

Q   Can you give me some examples, please?

A   In 1975 I became an avid runner, so I ran five miles every day. Since the accident I have maybe run five miles once a week and then I had to build back up to that. I started walking, you know, because when I would even try to run, my back would start to hurt, so I started walking. And then I progressed up to being able to run five miles. The other thing is --

Q   So presently you are able to run five miles then?

A   But not as often. I only can do it once a week where before I did it seven days a week.

Q   Okay.

Page 38

A   And I've gained 20 pounds as a result of it.

Q   Up until the day of this accident you were essentially running five miles every day?

A   Yes.

Q   And now you've worked back up to running five miles, but you only do it one time per week?

A   Yes.

Q   Are you working to improve that or increase that still?

A   I am. I'm trying to.

Q   Any other activities that have been interfered with?

A   Yes. Even driving up here, it's like last night I didn't rest because my back was aching. And normally, you know, once I stop and do my resting period and eat and everything, you know, I never -- I'm never tired or my back does not ache. And even now it's still aching because of sitting in one position for a long period of time.

I can't, you know, bend over. I have to be conscious of how I bend. I have to make sure that I use my knees now where before, you know, I could just bend. The other thing -- well, I mentioned sitting down for long periods of time. Even with my grandchildren, you know, I can't play with them like I used to, or my grandbaby. In fact, she came -- she would like for me to swing her around. Well, I can't do that any more. I just told her, "Nana can't do that." Or play with

Page 39

them in the playhouse, you know, because I can't bend and move around like I used to. I have to be cautious and careful about what it is that I do.

Q   How many grandchildren do you have?

A   Two.

Q   And how many children do you have?

A   Three.

Q   You got one here in Nacogdoches and the other two are located where?

A   One daughter in Dallas and my son is in South Carolina.

Q   Okay. Are there any other activities that have been interfered with that you would care to mention?

A   Yes. This is one that really -- it affected me for a long period of time after the accident. It's like even with driving, when I would drive, every time I stopped at a traffic light, I would be horrified that I would be hit from the back again. And it still bothers me even now. I'm constantly -- you know, if I stop, I look in the mirror to make sure, you know, that the car behind me is at least slowing down.

The other thing is, I used to wear four-inch heels to church and now I have to wear two-inch heels because if I -- you know, if I wear heels, it bothers my back from, you know, sitting or standing.

Q   Okay. And I know that that's probably not an

Page 40

exhaustive list, but I just wanted to kind of get an idea of some of the things that may have been interfered with. Okay?

A   Yes. And, actually, you know, when I'm doing my household chores now, I have to take breaks so that, you know, I can continue to complete my tasks.

MR. FLASOWSKI: Just answer a question when he has one.

THE WITNESS: Oh, okay.

Q   (BY MR. HUGHES) I see here where you have listed a -- actually, two Wal-Mart pharmacies in the Atlanta area as being a provider for which you have received some treatment as a consequence of the accident. Did you get some prescriptions after you got back to Atlanta?

A   Yes. I refilled the prescription that was given to me from the Medical Center.

Q   Okay. And did you refill it on -- it looks like you refilled it at two different places; is that correct?

A   Correct.

Q   Has that prescription presently expired?

A   Yes.

Q   Now, you mentioned to me that you did return to work at Kohl's following the accident; is that correct?

A   Correct.

Q   And I can't remember how long -- you told me how long you worked there and I can't remember. How long did you

Page 41

continue to work there at Kohl's?

A   I don't remember when I left. I think it was November, but I'm not sure.

Q   Why did you leave Kohl's?

A   Because I asked for some time off so that I could rest and my manager rejected my request and I needed to not be on my feet as much. I had explained to him that I was in a car accident.

Q   And your best recollection is that that would have been approximately November?

A   I believe it was, but I'm not sure.

Q   And the rest that you needed, that was time off because of your injuries; is that right?

A   Yes.

Q   Do you receive some type of retirement benefits in connection with your work at the Social Security Administration?

A   I do.

Q   Is it the type of thing where those benefits are reduced in any way because of your earnings or is it just the same whether you work or don't work?

A   It's the same whether I work or don't work.

Q   Other than your injuries from this accident, are you otherwise in generally good health?

A   Yes.

## Page 42

Q You described intermittent problems with your neck, back, hips and legs presently. Is that a fair way to describe it as intermittent?

A Yes.

Q And is there any way that you can characterize for me how often those occur?

A No.

Q Does it happen once a week, once a month?

A No. Because, like, I think it was February for two weeks I had -- I had back pain for two weeks. And it was one of those nagging, gnawing things that, you know, no matter what I did, it just didn't go away. And, you know, I did my stretches, you know, heating pad, cold pad, hot water. And so I don't know how long it's going to, you know, last or just when it comes on.

Q Okay. Have any of your doctors that you've been to told you about any future medical needs that you're likely to have because of the accident?

A No. I think Dr. Fowler and the physical therapist summed it up pretty well that I will continue to have these problems.

Q Have we discussed all of the injuries that you sustained in the accident?

A Yes.

MR. HUGHES: All right. Thank you for your

## Page 43

time, ma'am. I'll pass the witness.

MR. FLASOWSKI: I'll reserve my questions for the time of trial. We would like to read and sign.

(End of Proceedings.)

## Page 44

CHANGES AND SIGNATURE

PAGE   LINE   CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I, INEZ MANIGAULT, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
INEZ MANIGAULT

THE STATE OF TEXAS
COUNTY OF NACOGDOCHES

Before me, on this day, personally appeared INEZ MANIGAULT, known to me (or proved to me under oath) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2013.

_____
Notary Public in and for the
State of Texas

## Page 45

CAUSE NO. C1228525

INEZ MANIGAULT              * IN THE DISTRICT COURT
                           *
VS.                        * 145TH JUDICIAL DISTRICT
                           *
JANE THORN HENDERSON       * NACOGDOCHES COUNTY, TEXAS

REPORTER'S CERTIFICATION
DEPOSITION OF INEZ MANIGAULT
MARCH 22, 2013

I, Liesa Kliman, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, INEZ MANIGAULT, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____, 2013, to the witness or to the attorney for the witness for examination, signature and return to me by _____, 2013.

That the amount of time used by each party at the deposition is as follows:

W. WADE FLASOWSKI - 00:00(HOURS:MINUTES)

JAMES E. HUGHES  - 00:46(HOURS:MINUTES)

That $_____ is the deposition officer's charges to the DEFENDANT for preparing the original deposition transcript and any copies of exhibits;

That pursuant to the information given to the deposition officer at the time said testimony was taken, the following

Page 46

includes counsel for all parties of record:

W. WADE FLASOWSKI, Attorney for Plaintiff;

JAMES E. HUGHES, Attorney for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 or TRCP will be certified to after they have occurred.

Certified to by me this _____ day of _____, 2013.

_____

Liesa Kliman, CSR#2248
1205 Main Street
Garland, Texas 75040
972.494.2000
Expiration Date: 12/31/13
Firm Registration #216

Page 47

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to _____, Custodial Attorney;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this _____ day of _____, 2013.

_____

Liesa Kliman, CSR#2248
1205 Main Street
Garland, Texas 75040
972.494.2000
Expiration Date: 12/31/13
Firm Registration #216